**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 5 2000**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

FEDERAL ELECTION
COMMISSION,

      Plaintiff-Counter-
      Defendant - Appellant,

    v.

COLORADO REPUBLICAN
FEDERAL CAMPAIGN
COMMITTEE,

      Defendant-Counter-
      Plaintiff - Appellee.

-----------------------------
DEMOCRATIC SENATORIAL
CAMPAIGN COMMITTEE;
DEMOCRATIC CONGRESSIONAL
CAMPAIGN COMMITTEE;
COMMON CAUSE; DEMOCRACY
21; THE BRENNAN CENTER FOR
JUSTICE AT NEW YORK
UNIVERSITY SCHOOL OF LAW,

      Amici Curiae.

No. 99-1211

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D. Ct. No. 89-N-1159)**

---

David Kolker (Lawrence M. Noble, General Counsel, and Richard B. Bader,

Associate General Counsel, with him on the briefs), Federal Election Commission, Washington, DC, appearing for Appellant.

Jan Witold Baran (Thomas W. Kirby, Carol A. Laham, and Kirk L. Jowers, with him on the brief), Wiley, Rein & Fielding, Washington, DC, appearing for Appellee.

Robert F. Bauer and Marc E. Elias, Perkins Coie, LLP, Washington, DC, filed an amicus curiae brief for Democratic Senatorial Campaign Committee and Democratic Congressional Campaign Committee on behalf of Appellant.

Roger M. Witten, Daniel H. Squire, and Nicholas Coleman, Wilmer, Cutler & Pickering, Washington, DC; Fred Wertheimer, Democracy 21, Washington, DC; and Donald J. Simon, Common Cause, Washington, DC, filed an amicus curiae brief for Common Cause and Democracy 21 on behalf of Appellant.

Nancy Northup and Elizabeth Daniel, Brennan Center for Justice at New York University School of Law, New York, New York, filed an amicus curiae brief on behalf of Appellant.

---

Before **SEYMOUR**, Chief Judge, **TACHA**, and **KELLY**, Circuit Judges.

---

**TACHA**, Circuit Judge.

---

Section 441a(d)(3) of the Federal Election Campaign Act, 2 U.S.C. §§ 431-455, limits the amount of money a political party may spend in coordination with its candidates for Congress.  The Federal Election Commission (FEC) appeals the district court's ruling that this limitation violates the First Amendment.  We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

**I.**

We analyze § 441a(d)(3) within its statutory context.   The Federal Election

Campaign Act (FECA or "Act"), as amended in 1974, limited the amount of money that individuals, corporations, banks, labor organizations, political committees, (e.g., political action committees, or PACs), and political parties could contribute to candidates for federal office. See 18 U.S.C. §§ 608, 610 (1970 ed. Supp. IV). The Act also imposed limits on the amount these groups -- and the candidates themselves -- could spend in connection with a campaign for federal office. Id.

Shortly after Congress amended FECA, the Supreme Court struck down many of the Act's expenditure limits as unconstitutional under the First Amendment's free speech and association guarantees. Buckley v. Valeo, 424 U.S. 1, 39-59 (1976) (per curiam) (invalidating FECA provisions limiting (1) individual expenditures independent of a candidate's campaign, (2) a candidate's expenditure of personal funds, and (3) overall campaign expenditures); see also Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 497 (1985) (NCPAC) (invalidating FECA provision limiting independent expenditures by political committees).

However, the Court generally has upheld FECA's contribution limits. Buckley, 424 U.S. at 28, 29, 35-36 (finding constitutional the Act's limits on the amount individuals and political committees can contribute to a candidate for federal office); California Med. Ass'n v. Federal Election Comm'n, 453 U.S. 182,

193-99 (1981) (upholding limits on the amount individuals may contribute to political committees). Furthermore, the Supreme Court has recognized that "coordinated expenditures" qualify as contributions under FECA and, therefore, are subject to FECA's contribution limits. Buckley, 424 U.S. at 46-47; NCPAC, 470 U.S. at 492. Thus, FECA's contribution limits apply not only when an individual or group contributes money directly to a campaign, but also when an individual or group contributes money indirectly by making expenditures coordinated with the campaign. See 2 U.S.C. § 441a(a)(7)(B)(i) ("[E]xpenditures made by any person in cooperation, consultation, or concert with . . . a candidate . . . shall be considered to be a contribution to such candidate.").

As presently codified, the Act sets the following contribution limits: A "person" is entitled to contribute $1000 to a candidate "with respect to any election for Federal office;" $5000 in any calendar year to a political committee that is not established and maintained by a national political party; and $20,000 in any calendar year to the political committees of a national political party. 2 U.S.C. § 441a(a)(1). However, no person may make contributions totaling more than $25,000 in any year. Id. § 441a(a)(3). A "multicandidate political committee" (or PAC) may contribute $5000 to a candidate with respect to any federal election; $5000 in any calendar year to any other political committee that is not established and maintained by a national political party; and $15,000 in any

calendar year to the political committees of a national political party.  Id. § 441a(a)(2).

National and state political parties meet FECA's definition of "multicandidate political committees."  See id. § 441a(a)(4) (defining a "multicandidate political committee" as "a political committee . . . which has received contributions from more than 50 persons, and . . . has made contributions to 5 or more candidates for Federal office").  Thus, political parties ordinarily would be subject to the above dollar limits.  However, Congress recognized that parties are different than PACs.  Consequently, Congress exempted political parties from the Act's general contribution limits and imposed substitute limits upon them.  Id. § 441a(d)(1), (3).  Section 441a(d)(3), known as the Party Expenditure Provision, provides that political parties "may not make any expenditure in connection with the general election campaign of a candidate for Federal office" which exceeds the greater of $20,000 or 2 cents multiplied by the voting age population of the state.[1]  Id. § 441a(d)(3).

## II.

The prior proceedings in this case have narrowed the issues we must decide.  In January 1986, Timothy Wirth, then a Democratic Congressman from

---

[1]A separate provision, § 441a(d)(2), limits party expenditures in connection with Presidential campaigns.  Our analysis and holding apply only to party spending in connection with congressional races.

Colorado, announced that he would seek Colorado's open Senate seat in November. Several months later, before the Democratic primary or the Republican convention, the Colorado Republican Federal Campaign Committee ("Colorado Party" or "Party") developed and aired a radio advertisement criticizing Wirth's voting record. In its quarterly report to the FEC, the Party classified the advertisement outlay as an operating expense instead of a § 441a(d)(3) expenditure. The Colorado Democratic Party filed an administrative complaint with the FEC, alleging that the Party's purchase of radio time was an expenditure in connection with the Senate campaign and exceeded § 441a(d)(3)'s spending limit. The FEC agreed with the Democratic Party and filed suit in district court against the Colorado Party.

On motion for summary judgment, the Party argued that the outlay did not fall within the Party Expenditure Provision because the Colorado Party did not develop the advertisement "in connection with" the campaign of any federal candidate. The Party also asserted a counterclaim, alleging that the Party Expenditure Provision violated its First Amendment rights of free speech and association. The district court narrowly interpreted § 441a(d)(3) as limiting only those expenditures that use "'express words of advocacy of election or defeat.'" Federal Election Comm'n v. Colorado Republican Fed. Campaign Comm., 839 F. Supp. 1448, 1455 (D. Colo. 1993) (quoting Buckley, 424 U.S. at 44 n.52). Under

this statutory construction, the district court found that the provision did not cover the Wirth advertisement and entered summary judgement in favor of the Party. Id. at 1456-57. Because the court resolved the dispute on statutory grounds, it did not reach the Party's constitutional challenge. Id. at 1457.

On appeal, the FEC argued for a broader interpretation of the provision as limiting "expenditures depicting a clearly identified candidate and conveying an electioneering message." Federal Election Comm'n v. Colorado Republican Fed. Campaign Comm., 59 F.3d 1015, 1022 (10th Cir. 1995). We agreed with the FEC and thus concluded that the advertisement was subject to the limits of the Party Expenditure Provision. Id. at 1023. We also reached the constitutional challenge and held that § 441a(d)(3) did not impermissibly burden the Party's First Amendment rights. Id.

The Supreme Court granted certiorari "primarily to consider the Colorado Party's argument that the Party Expenditure Provision violates the First Amendment either facially or as applied." Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 613 (1996) (internal quotation marks and citation omitted) ("Colorado I"). Three members of the Court found the provision unconstitutional as applied to the expenditure at issue, and four

other Justices joined in this judgment. Id. at 608.[2]

Based on the summary judgment record before it, the plurality noted that the Colorado Party had developed and approved the advertisement script independent of any candidate for Federal office. Id. at 613-14. In fact, at the time the advertisement was placed, the Party had not yet selected a senatorial nominee. Id. Thus, the plurality concluded that the advertisement in question was an "independent expenditure," not a "coordinated expenditure" subject to the limits of § 441a(d)(3). Id. at 613. As such, the expenditure was entitled to full First Amendment protection under controlling precedent. Id. at 614-15 (citing NCPAC, 470 U.S. at 97; Buckley, 424 U.S. at 19-21).

Having found the provision unconstitutional as applied to this particular independent expenditure, the plurality declined to reach the broader question of whether the First Amendment forbids limits on coordinated expenditures by political parties. Id. at 623. Instead, the Court remanded the case to the district court for further proceedings, noting that "to our knowledge, this is the first case in the 20-year history of the Party Expenditure Provision to suggest that in-fact

---

[2] The four Justices who concurred in the judgment also dissented in part, urging the Court to resolve the Party's facial challenge to § 441a(d)(3). Colorado I, 518 U.S. at 626 (Kennedy, J., concurring in the judgment and dissenting in part); id. at 631 (Thomas, J., concurring in the judgment and dissenting in part). Chief Justice Rehnquist and Justice Scalia joined Justice Kennedy's opinion in full and Justice Thomas's opinion in part.

coordinated expenditures by political parties are protected from congressional regulation by the First Amendment." Id. at 624.

On remand, the parties compiled an extensive record, focusing exclusively on the novel constitutional question highlighted in Colorado I. On cross motions for summary judgment, the district court concluded that the FEC had "failed to offer evidence which demonstrates the compelling need for limits on political party coordinated expenditures." Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n, 41 F. Supp.2d 1197, 1213 (D. Colo. 1999).[3] The court therefore declared the Party Expenditure Provision unconstitutional and entered summary judgment in favor of the Party. Id. at 1213-14. This appeal followed.

## III.

We review a decision granting summary judgment de novo, applying the same legal standard used by the district court. Mesa v. White, 197 F.3d 1041,

---

[3] The plurality in Colorado I noted that neither the parties nor the lower courts had "considered whether Congress would have wanted the Party Expenditure Provision's limitations to stand were they to apply only to coordinated, and not to independent, expenditures." 518 U.S. at 625. Thus, the plurality directed the parties on remand to brief this "nonconstitutional ground for exempting party coordinated expenditures from FECA limitations." Id. at 625-26. On remand, the Colorado Party argued that FECA's unconstitutional limit on a party's independent expenditures could not be severed from its limit on a party's coordinated spending. Thus, the Party insisted that § 441a(d)(3) must fail as a matter of statutory construction. The district court disagreed and found that the Party Expenditure Provision, as it applies to coordinated expenditures, remained in effect after Colorado I. 41 F. Supp.2d at 1207. On appeal, the parties raise only the constitutional question.

1043 (10th Cir. 1999). In First Amendment cases, "the de novo standard is appropriate . . . for the further reason that . . . an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." Id. (internal quotation marks and citation omitted). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Determining the standard of scrutiny appropriate for the constitutional analysis is more complicated than determining our standard of review. In Buckley, the Supreme Court referred generally to "the exacting scrutiny required by the First Amendment," 424 U.S. at 16, and added specifically "that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office," id. at 15 (internal quotation marks and citation omitted). In Colorado I, the plurality concluded that the government must demonstrate a "compelling" interest to restrict the First Amendment freedoms of candidates and their supporters. 518 U.S. at 609. Such language suggests "strict scrutiny" of campaign finance regulation in general.

However, the Supreme Court most recently revisited the standard of

scrutiny as to campaign contribution limits in particular. See Nixon v. Shrink Mo. Gov't PAC, 120 S. Ct. 897 (2000). In Shrink Missouri, the Court construed a state statute that limited each person to a contribution of $1000, adjusted for inflation, in support of candidates for various statewide offices. Id. at 901-02. The Court upheld the statute against a First Amendment challenge. In doing so, the Court recognized that the Buckley distinction between (permissible) restrictions on contributions and (impermissible) restrictions on expenditures implies that different types of FECA limits require different levels of justification. Id. at 903-04. Prior to Shrink Missouri, the Court had made this implied distinction explicit in Federal Election Comm'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 259-60 (1986) ("We have consistently held that restrictions on contributions require less compelling justification than restrictions on independent spending."). The Shrink Missouri court thus restated the standard of scrutiny for contribution limits as follows:

> [U]nder Buckley's standard of scrutiny, a contribution limit involving "significant interference" with associational rights could survive if the Government demonstrated that contribution regulation was "closely drawn" to match a "sufficiently important interest," though the dollar amount of the limit need not be "fine tun[ed]."

120 S. Ct. at 904 (quoting Buckley, 424 U.S. at 25, 30).[4]

---

[4]We note that the Court appears internally divided over the appropriate level of scrutiny. Compare Shrink Mo., 120 S. Ct. at 917 (Thomas, J., dissenting) (criticizing "the majority's refusal to apply strict scrutiny to contribution limits"),

In this case, we must determine whether the FEC can justify § 441a(d)(1)'s limit on coordinated expenditures by political parties. Since FECA treats coordinated expenditures as "contributions," 2 U.S.C. § 441a(a)(7)(B)(i), and the Court has recognized this statutory classification, NCPAC, 470 U.S. at 492, we apply the foregoing standard to our review of the Party Expenditure Provision.

However, we admit some difficulty in applying this standard to this particular contribution limit. As noted in Shrink Missouri, the Supreme Court has found in general that contribution limits bear "more heavily on the associational right than on freedom to speak." Shrink Mo., 120 S. Ct. at 904. This finding rested in part upon the recognition that contribution limits ordinarily "entail[] only a marginal restriction upon the contributor's ability to engage in free communication." Buckley, 424 U.S. at 20. In the case of political parties, though, a limit upon the amount a party can spend in coordination with its candidates certainly entails more than a "marginal restriction" upon the party's free speech. Indeed, in the context of an election, a party speaks in large part through its identified candidates; candidates, in significant measure, speak for their political parties.[5] We therefore question whether the

_____

with id. at 911 (Breyer, J., concurring) (concluding that, in this case, "there is no place for a strong presumption against constitutionality, of the sort often thought to accompany the words 'strict scrutiny'").

[5] Notwithstanding the dissent's charge, we do not conclude that parties and their candidates share an identity of interest. We, like the plurality in Colorado I,

contribution/expenditure dichotomy which underlies the Shrink Missouri standard applies with equal force in this case. However, we need not resolve this question definitively because the Party Expenditure Provision fails even under the more deferential standard reformulated in Shrink Missouri.

**IV.**

The Buckley court recognized the "prevention of corruption and the appearance of corruption" as "constitutionally sufficient justification[s]" for the regulation of campaign contributions. 424 U.S. at 25, 26. "[I]mproper influence" and "opportunities for abuse" go beyond bribery and "extend[] to the broader threat from politicians too compliant with the wishes of large contributors." Shrink Mo., 120 S. Ct. at 905.

> To the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined. . . . Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions. . . . [In enacting contribution limits] Congress could legitimately conclude that the avoidance of the appearance of improper influence "is also critical . . . if confidence in the system of representative Government is not to be eroded to a disastrous extent."

Id. at 26-27 (quoting United States Civil Serv. Comm'n v. National Ass'n of

---

will not assume any "metaphysical identity" between party and candidate. We simply make the common sense observation that limiting a party's speech through its identified candidates imposes more than a marginal restriction upon that party's First Amendment freedoms.

Letter Carriers, 413 U.S. 548, 565 (1973)).

Since Buckley, the Court has stated that "preventing corruption or the appearance of corruption are the only legitimate and compelling government interests thus far identified for restricting campaign finances." NCPAC, 470 U.S. at 496-97. While corruption or the appearance thereof are constitutionally sufficient justifications, the FEC in this case must show that political parties through their spending authority corrupt or appear to corrupt the electoral process. The opportunity for corruption or its appearance is greatest when the political spending is motivated by economic gain. As discussed below, political parties are diverse entities, one step removed from the candidate, and they exist for noneconomic reasons. Much like an advocacy group, a party functions "to disseminate political ideas, not to amass capital. The resources it has available are not a function of its success in the economic marketplace, but its popularity in the political marketplace." See Massachusetts Citizens for Life, 479 U.S. at 259. Political parties have played a vital role in the American system of government.

> [A]stute observers[] all agree that the political party is -- or should be -- central to the American political system. Parties are -- or should be -- integral parts of all political life, from structuring the reasoning and choice of the electorate, through all facets of campaigns and seemingly all facets of the government, to the very possibility of effective governance in a democracy.

John H. Aldrich, Why Parties: The Origin and Transformation of Political Parties in America 18 (1995). From the birth of this republic into the 21st century,

political parties have provided the principal forum for political speech and the principal means of political association. See, e.g., Clinton Rossiter, Parties and Politics in America 1 (1960) (declaring that there is "[n]o America without democracy, no democracy without politics, and no politics without parties. . . ."). Political speech and association, unfettered by unnecessary government interference, are the lifeblood of a free and independent republic. We need only look to the struggling new republics of our time to confirm this principle.

In its FECA enactments, Congress certainly recognized the importance of parties. See H.R. Conf. Rep. No. 94-1057, at 58 (1976) (acknowledging that political parties fulfill a "unique role in the political process"), S Rep. No. 93-689, at 3,7 (1974) (declaring that political parties "serve as a legitimate pooling mechanism for private contributions to candidates in general elections" and concluding that "a vigorous party system is vital to American politics").

The Supreme Court likewise has acknowledged the role of the party. See, e.g., Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 222-25 (1989), Tashjian v. Republican Party of Conn., 479 U.S. 208, 214-15 (1986); see also Davis v. Bandemer, 478 U.S. 109, 144-45 (1986) (O'Connor, J., concurring in the judgment) ("There can be little doubt that the emergence of a strong and stable two-party system in this country has contributed enormously to sound and effective government. The preservation and health of our political institutions,

state and federal, depends to no small extent on the continued vitality of our two-party system, which permits both stability and measured change."). Indeed, all three branches of government, to an important extent, rely on the speech and associational functions of parties to assure the orderly conduct of elections, appointments and governance in general.

In Colorado I, the plurality acknowledged that they "are not aware of any special dangers of corruption associated with political parties" in the context of independent spending. 518 U.S. at 616. Remand has only confirmed that conclusion for this court in the context of coordinated spending. We are convinced that Shrink Missouri, decided during the pendency of this appeal, does not alter this conclusion. As we discuss later, *infra* note 9, Shrink Missouri involved a straightforward application of Buckley to uphold counterpart state contribution limits. The Court did not confront the more difficult issue of whether limits on coordinated spending by political parties are consistent with the First Amendment.

The FEC submits essentially three theories on how coordinated spending by political parties corrupts, or creates the appearance of corrupting, our electoral system. Were any of these theories valid, one would have to question why Congress permits any coordinated expenditures by political parties, let alone removes them from the Act's more restrictive limits. At a minimum, Congress

has signaled that political parties are different than individuals and other organizations.

**A.**

The FEC first argues that contributors to a political party – individuals or PACs – can corrupt (or appear to corrupt) the political process through their influence over a party. Under this theory, a contributor gives so much money to a party that the party grows beholden to the donor. The party then exercises its coordinated expenditure authority to either support or neglect those candidates who endorse or eschew the interests of the large contributor. By limiting the spending authority of a political party, the Party Expenditure Provision limits the financial leverage a party can exert on behalf of a generous donor.

To support this theory, the FEC submitted the declaration of former Senator Paul Simon and other evidence concerning meetings between party donors and federal officeholders. In his declaration, Simon describes a meeting of the Democratic Caucus where members discussed an amendment to a bill that was already before the House-Senate Conference Committee. Simon opposed the amendment because it had not passed through the typical committee hearing process. The amendment clearly benefitted one particular corporation, and Simon referenced published reports that this corporation had contributed $1.4 million in the last election cycle to incumbent members of Congress. One of

Simon's senior colleagues spoke out in favor of the amendment, saying: "I'm tired of Paul always talking about special interests; we've got to pay attention to who is buttering our bread." R. at 466.

This anecdote, along with the FEC's other evidence, might say something about corporate influence over the legislative process. But this evidence does not demonstrate that parties undermine the integrity of the electoral process. Corporate giving may indeed influence legislators, and Congress recognized this danger in enacting FECA. See, e.g., Federal Election Comm'n v. National Right to Work Comm., 459 U.S. 197, 209-10 (1982) ("[FECA] reflects a legislative judgment that the special characteristics of the corporate structure require particularly careful regulation."). Consequently, corporations may not make contributions or expenditures in connection with any federal election, 2 U.S.C. § 441b(a), and PACs organized by such corporations are subject to strict dollar limits, id. § 441a(a)(2).

The FEC may find these limits inadequate to eliminate all corporate sway over members of Congress. If so, this argument should be addressed to Congress, not to this court in this case. We will not validate limits on the protected speech of a political party as a back-door means of stemming corporate involvement in the legislative process. See Massachusetts Citizens for Life, 479 U.S. at 265 ("Where at all possible, government must curtail speech only to the degree

necessary to meet the particular problem at hand, and must avoid infringing on speech that does not pose the danger that has prompted regulation.").

To overcome a constitutional challenge, the FEC must demonstrate that a restriction on coordinated expenditures by political parties is "closely drawn" to match important government interests. Shrink Mo., 120 S. Ct. at 904 (internal quotation marks and citation omitted). However, many of the interests identified by the FEC are hardly vindicated by this restriction. For example, the party may become an independent power source, seek contributions from interest groups and attempt to influence members' votes regardless of any limitation on coordinated expenditures. After all, Colorado I confirms that a party may make unlimited expenditures independent of its candidates. Moreover, as the district court observed, many of the activities the FEC wishes to curtail are consistent with our model of representative democracy. Colorado Republican Fed. Campaign Comm., 41 F. Supp.2d at 1210-13.

The FEC insists that we must also consider the corrupting influence of corporate, bank and union money contributed to political parties outside of FECA's limits, so-called "soft money" contributions. In the parlance of campaign finance, FECA regulates only "hard money." Hard money is the common term for the limited and disclosed funds parties raise from individuals and PACs in conformity with the FECA limits outlined in the opening section. Parties may use

only hard money to expressly advocate the election or defeat of federal candidates, and corporations, national banks and labor organizations cannot make hard money contributions to political parties. 2 U.S.C. § 441b(a).

FECA does not regulate so-called "soft money" contributions. An individual or group may contribute unlimited amounts of soft money to a political party. However, the party may use soft money only for limited activities, such as electing candidates for state office, see id. § 431(8)(A)(i), or for voter registration and "get-out-the-vote" drives, see id. § 431(8)(B)(xii). Thus, unregulated soft money contributions may not be used to influence a federal campaign, except through the limited party-building activities specifically designated in the statute.

The FEC contends that large soft money donors purchase influence over a political party, and the Party Expenditure Provision must be maintained to ensure that a party does not pressure its candidates to heed this influence. We appreciate the FEC's concern over soft money, but this proceeding does not present the opportunity for soft money reform. In this case, we address only the constitutionality of § 441a(d)(3)'s limit on hard money coordinated expenditures. The FEC has presented no evidence to suggest that parties have illegally utilized soft money for hard money spending. Absent such a showing, we will not allow the appearance of soft money excess to justify a limit on hard money

expenditures.[6]

## B.

The FEC next contends that unscrupulous party officials can utilize the party's coordinated spending authority to further their personal interests or those of an unrepresentative party faction. Under this theory, the cap on coordinated expenditures limits the party elite from corrupting (or appearing to corrupt) the electoral process through improper pressure upon its own candidates. The FEC submits evidence that a small group of incumbent officeholders controls coordinated spending decisions, and certain incumbents have utilized this power to support candidates in their home states.

This theory, unlike the first, has the appeal of directly targeting the source

---

[6] As part of its evidence below, the FEC submitted newspaper articles and editorials concerning soft and hard money. The district court did not make an evidentiary ruling on any individual article, but it did make general comments concerning the admissibility and weight of the articles. See, e.g., Colorado Republican Fed. Campaign Comm., 41 F. Supp.2d at 1200 ("The FEC makes numerous factual assertions, for example, based on reports in newspaper articles. Except as otherwise noted, the discussion which follows simply ignores the mass of irrelevant and/or inadmissible evidence in the record . . . ."). It appears to us that the district court considered all the submitted evidence, while acknowledging evidentiary weaknesses therein. Thus, we also consider the full record before us. We note, however, that media accounts documenting a vague (though visceral) public cynicism about campaign finance prove too little. We should not allow generic public dissatisfaction to support the restriction of political speech. See NCPAC, 470 U.S. at 499-500 (concluding that "newspaper articles and polls purportedly showing a public perception of corruption" fall "far short" of the required evidence to justify a limitation on the independent expenditures of PACs).

of alleged corruption.   If party elites corrupt the electoral process, then a limit on

coordinated spending directly curtails one means of this alleged corruption.

However, the premise of this theory, namely that political parties can corrupt the

electoral system by influencing their candidates' positions, gravely

misunderstands the role of political parties in our democracy.[7]

> To state the matter with utmost simplicity: political parties, with all their
> well-known human and structural shortcomings, are the only devices thus

---

[7] The dissent mischaracterizes the object of our criticism.  According to the dissent, we accuse <u>Congress</u> of undervaluing the role of the party.  This is simply not true.  As we noted earlier, *supra* Part IV, Congress has recognized the party's unique role in the political process.  The plurality in <u>Colorado I</u> found that the legislative history of FECA "rather than indicating a special fear of the corruptive influence of political parties . . . demonstrates Congress' general desire to enhance what was seen as an important and legitimate role for political parties in American elections."  518 U.S. at 618.

The object of our criticism is the FEC.  Defying this clear congressional intent, the FEC argued before this court that Congress limited a party's coordinated expenditures out of a fear of corruption.  The Supreme Court in this case has suggested otherwise.  "[T]his Court's opinions suggest that Congress wrote the Party Expenditure Provision not so much because of a special concern about the potentially 'corrupting' effect of party expenditures, but rather for the constitutionally insufficient purpose of reducing what it saw as wasteful and excessive campaign spending."  <u>Id</u>.   We therefore do not take issue with Congress on this point but rather reject the FEC's post hoc rationalization for this particular provision.

Nevertheless, in construing an enactment of Congress, we must necessarily review some judgments made by the legislative body.  But that, of course, is our fundamental duty.  <u>See</u> <u>Marbury v. Madison</u>, 1 Cranch 137, 177, 2 L.Ed. 60 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").  We are mindful of the need for deference to Congress in this particular arena and appreciate the dissent's repeated reminders on this count.  However, such deference must ultimately give way to our constitutional obligation.

far invented by the wit of Western man which with some effectiveness can generate countervailing collective power on behalf of the many individually powerless against the relatively few who are individually -- or organizationally -- powerful.

Walter Dean Burnham, Critical Elections and the Mainsprings of American Politics 133 (1970). Political parties today represent a broad-based coalition of interests, and there is nothing pernicious about this coalition shaping the views of its candidates. Parties are simply too large and too diverse to be corrupted by any one faction. Evidence in the record demonstrates that the parties' hard money comes from individual donors who give, on average, less than $40. As amici recognized in Colorado I, the old rule of sanitary engineers applies here: the solution to pollution is dilution. Amicus Curiae Br. of the Committee for Party Renewal, Colorado I, 518 U.S. 604 (1996) (No. 95-489).

Even if, as the FEC contends, party leaders subvert the greater will of the rank-and-file membership, we trust the members to replace their leaders. It is true that political parties have been involved in wrongdoing, dating back to the Tammany Hall machine. However, the electoral and litigation processes have always managed to right these wrongs. Given the importance of political parties to the survival of this democracy, we reject the notion that a party's influence over the positions of its candidates constitutes "a subversion of the political process." NCPAC, 470 U.S. at 497.

## C.

Finally, the FEC contends that the Party Expenditure Provision must be upheld to prevent evasion of the Act's other contribution limits. For example, an individual may contribute only $1000 directly to a candidate for federal office, 2 U.S.C. § 441a(a)(1)(A), but may contribute up to $20,000 of hard money to a national political party, id. § 441a(a)(1)(B). The FEC claims that if the coordinated expenditure limit is struck down, individuals will circumvent the $1000 limit by contributing $20,000 to a political party with the expectation that this money be used to support a particular candidate.

The Supreme Court has recognized that certain contribution limits serve to protect the integrity of others. CMA, 453 U.S. at 198-99; Buckley, 424 U.S. at 38. We agree with the FEC that if an individual used the party as a conduit to channel money to specified candidates, this would certainly threaten the integrity of the individual contribution limit. However, Congress evidently foresaw this avenue of abuse and foreclosed it. The Act provides that individual "contributions which are in any way earmarked or otherwise directed through an intermediary or conduit" to a particular candidate shall be treated as contributions from the original source to the candidate. 2 U.S.C. § 441a(a)(8); see 11 C.F.R. § 110.6(b)(1) (2000) (defining "earmarked" as any "designation, instruction, or encumbrance, whether direct or indirect, express or implied, oral or written, which results in all or any part of a contribution being made to . . . a clearly

identified candidate").

Under this provision and its expansive agency interpretation, the FEC certainly has the authority to ensure that individuals do not use political parties to circumvent the Act's other contribution limits. Vigilant enforcement of § 441a(a)(8), rather than a severe abridgement of party speech, is a more appropriate and direct means to safeguard the integrity of the individual contribution limits.[8]

## V.

We recognize that the Supreme Court typically has upheld limits upon political contributions and that FECA treats coordinated expenditures by a political party as contributions. However, in this case, a simple cubbyholing of constitutional values under the labels "contribution" and "expenditure" cheapens the currency. See, e.g., National Ass'n for the Advancement of Colored People v. Button, 371 U.S. 415, 429 (1963) (stating that the government "cannot foreclose the existence of constitutional rights by mere labels"). We also recognize that the

---

[8] We profess some confusion at the dissent's analysis on this point. The dissent maintains that § 441a(a)(8) operates only as a disclosure provision, and that disclosure alone is a partial measure that may be supplemented with valid contribution ceilings. We agree that disclosure is only a partial measure, but § 441a(a)(8) does not stop at disclosure. All earmarked contributions must be disclosed, and such contributions are then subject to the strict contribution ceilings under the Act. Thus, while § 441a(a)(8) does provide for disclosure, this disclosure then triggers enforcement of the concomitant individual contribution limit upheld in Buckley.

Buckley court was concerned about the "real or imagined coercive influence of large financial contributions on candidates' positions." Id. at 25. But the Buckley court so defined corruption for the purpose of reviewing limits upon giving and spending by individuals, PACs and candidates. Because the Buckley litigants did not challenge the Party Expenditure Provision on First Amendment grounds, the Court said nothing about the First Amendment implications of restricting party speech on behalf of its candidates. Id. at 58 n.66. To encompass political parties within the Buckley language on corruption would require a real extension of this precedent. Such an extension is not warranted by the Court's post-Buckley FECA jurisprudence and would betray the historic importance of political parties. See Colorado I, 518 U.S. at 629 (Kennedy, J., concurring in the judgment and dissenting in part) ("In my view, we should not transplant the reasoning of cases upholding ordinary contribution limitations to a case involving FECA's restrictions on political party spending.").

In sum, we conclude that the Party Expenditure Provision constitutes a "significant interference" with the First Amendment rights of political parties. Buckley, 424 U.S. at 25 (internal quotation marks and citation omitted). This interference effects more than a "marginal restriction upon the [parties'] ability to engage in free communication." Id. at 20. The FEC has not demonstrated on remand that coordinated spending by political parties corrupts, or creates the

appearance of corrupting, the electoral process.[9]  Therefore,  § 441a(d)(3)'s limit on party spending is not "closely drawn" to the recognized governmental interest but instead constitutes an "unnecessary abridgment" of First Amendment freedoms.[10]

---

[9] The dissent contends that we betray the evidentiary threshold applied in Shrink Missouri.  As the dissent accurately recounts, the Shrink Missouri court did caution against too rigorous an evidentiary standard in the context of campaign finance.  However, those words of caution must be read in light of the particular challenge before the Court in that case.  The state provision before the Court in Shrink Missouri limited each person to a contribution of $1000, adjusted for inflation, in support of candidates for various statewide offices.  The Court found that this provision bore a "striking resemblance to the limitations sustained in Buckley."  Shrink Mo., 120 S Ct. at 908.  As a consequence, the Court ultimately concluded that "[t]here is no reason in logic or evidence to doubt the sufficiency of Buckley to govern this case."  Id. at 910.

Since the case "d[id] not present a close call," the Court declined any "further definition" of the government's evidentiary obligation.  Id. at 907.  However, the Court did indicate that there might be "need for a more extensive evidentiary documentation if petitioners had made any showing of their own to cast doubt on the apparent implications of Buckley's evidence."  Id. at 908.  In our judgment, the Colorado Party has amply demonstrated that the evidence before the Buckley court is largely inapposite to the constitutionality of this provision.  As noted earlier, the Buckley litigants did not challenge the Party Expenditure Provision on First Amendment grounds.  Therefore, the Court said nothing about the First Amendment implications of restricting party speech through its candidates.

The Shrink Missouri court essentially incorporated by reference the Buckley evidence, because the disposition amounted to a routine application of the Buckley precedent.  As we have demonstrated, this case does not involve a routine application of Buckley.  Therefore, it was incumbent upon the FEC to make a more extensive evidentiary showing, which they failed to do.

[10] In Colorado I, the plurality indicated that the more restrictive limits upon coordinated spending by a "multicandidate political committee," see § 441a(a)(2), would apply to political parties if the entire Party Expenditure Provision were struck down.  518 U.S. at 625.  Heeding this signal from the Court, the Party on remand challenged all FECA limits to the extent they restrict coordinated spending by political parties.  The district court did not strike § 441a(a)(2) as

- 27 -

Id. at 25.


**AFFIRMED.**

---

applied to political parties, and we decline to do so as well. The record contains no evidence of a credible threat by the FEC to enforce this provision against political parties. Therefore, this particular issue is not ripe for our resolution. See Renne v. Geary, 501 U.S. 312, 321-22 (1991) (finding no justiciable controversy in a First Amendment political speech case where there was "no factual record of an actual or imminent application" of the challenged provision).

**No. 99-1211, Federal Election Commission v. Colorado Republican Federal Campaign Committee**

**SEYMOUR, Chief Judge, dissenting.**

The majority opinion is fundamentally flawed in several aspects. First, the discussion and analysis are permeated with and skewed by the majority's determination to substitute its judgment for that of Congress on quintessentially political matters the Supreme Court has cautioned courts to leave to the legislative process. In so doing, the majority creates a special category for political parties based on its view of their place in American politics, a view at odds with history and with legislation drafted by politicians. The majority supports its decision to accord political parties an exemption from contribution limits Congress believed necessary to protect the integrity of the democratic political process by discounting the type of evidence the Supreme Court has recently held sufficient to substantiate congressional concerns, and by relying instead on evidence the Court has expressly discounted. Accordingly, I respectfully dissent.

**I**

As originally enacted, the Federal Election Campaign Act (FECA or the Act), 2 U.S.C. §§ 431-455, placed limits on both political contributions and expenditures. The primary interest to be served by these limitations was "the prevention of corruption and the appearance of corruption spawned by the real or imagined

coercive influence of large financial contributions on candidates' positions and on their actions if elected to office." *Buckley v. Valeo*, 424 U.S. 1, 25 (1976). In *Buckley*, the Supreme Court was faced with First Amendment challenges to several sections of FECA and drew a distinction for purposes of First Amendment analysis between expenditures and contributions. The Court viewed limits on expenditures as a direct restraint on political speech but characterized contribution limits as entailing only a marginal restriction. Accordingly, the Court upheld the $1000 limit on contributions by individuals and groups to a particular candidate or authorized campaign committee for any single election, *id.* at 23-35, the $5000 limit on contributions by a political committee to a single candidate, *id.* at 35-36, and the $25,000 limit on total annual contributions by an individual, *id.* at 38.

The Court reached a different result with respect to limits on expenditures and held unconstitutional the $1000 limit on *independent* expenditures for communications advocating the election or defeat of an identified candidate. *Id.* at 39-51. The Court also struck down the ceiling on a candidate's personal expenditures as unsupported by the governmental interest in preventing actual and apparent corruption, *id.* at 51-54, and invalidated that section of the Act limiting overall campaign expenditures by candidates for federal office, *id.* at 54-58.

As indicated by *Buckley*, FECA regulates two types of expenditures: those that are coordinated with a candidate and those that are made independently.

Coordinated expenditures are considered contributions under section 441a(a)(7)(B)(i) and therefore may be subject to limits not permissible with respect to independent expenditures. Prior to the Supreme Court ruling in this case, *see Colorado Republican Fed. Campaign Comm. v. Federal Election Comm'n*, 518 U.S. 604 (1996), the FEC had construed FECA as requiring that all party expenditures be deemed coordinated.

The instant appeal concerns section 441a(d)(3),[1] a provision of the Act not at issue in *Buckley*, which limits the amount a committee for a political party can spend in connection with the general election campaign of a candidate for federal office. The expenditure at issue was made by the Colorado Republican Federal Campaign Committee for a radio advertisement criticizing an announced Democratic

---

[1] That section provides:
  **(3)** The national committee of a political party, or a State committee of a political party, including any subordinate committee of a State committee, may not make any expenditure in connection with the general election campaign of a candidate for Federal office in a State who is affiliated with such party which exceeds–
    **(A)** in the case of a candidate for election to the office of Senator or of Representative from a State which is entitled to only one Representative, the greater of–
      **(i)** 2 cents multiplied by the voting age population of the State (as certified under subsection (e) of this section); or
      **(ii)** $20,000; and
    **(B)** in the case of a candidate for election to the office of Representative, Delegate, or Resident Commissioner in any other State, $10,000.
2 U.S.C. § 441a(d)(3).

candidate that aired before either party had actually nominated senatorial candidates. In line with the FEC's position, the district court in its original opinion held that the expenditure was coordinated even though no Republican candidate had been nominated at the time. Nonetheless the court ruled that the expenditure did not violate the Act, holding that because it did not constitute express advocacy, it was not made "in connection with" the Republican candidate within the meaning of section 441a(d)(3). *See Federal Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 839 F. Supp. 1448 (D. Colo. 1993).

On appeal, this court disagreed and held that section 441a(d)(3) applied to coordinated spending that involved a clearly identified candidate and an electioneering message without regard to whether the message constitutes express advocacy. *See Federal Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 59 F.3d 1015 (10th Cir. 1995). We further held that the limit imposed by the section on coordinated expenditures did not violate the First Amendment.

In a fractured opinion, the Supreme Court vacated and remanded. *See Colorado Republican Fed. Campaign Comm.*, 518 U.S. 604. The plurality opinion of Justice Breyer, joined by Justices O'Connor and Souter, rejected the FEC's argument that all expenditures by political parties must be deemed coordinated, and held that the expenditure here was in fact independent and that a limit on independent expenditures by political parties was unconstitutional under *Buckley*.

In so doing, the plurality emphasized "the fundamental constitutional difference" between independent expenditures and contributions to a candidate to be spent on his campaign. *Id.* at 614-15. The plurality held that the government's interest in preventing corruption and the appearance of corruption was not sufficient to justify the restriction on independent spending, observing that while the danger of a political quid pro quo was not eliminated, that danger was alleviated by the absence of prearrangement and coordination. The plurality did not reach the issue of whether FECA's limit on *coordinated* expenditures by political parties is facially invalid under the First Amendment, pointing out that the issue had not been adequately developed in the lower courts.

Justices Kennedy, Rehnquist, Scalia, and Thomas agreed with the plurality but would have gone further to hold the spending limit invalid as applied to all expenditures, independent and coordinated. Justice Thomas, standing alone, also advocated the abandonment of the analysis in *Buckley* altogether. Justices Stevens and Ginsburg dissented on the ground that all money spent by a political party should be deemed a contribution to the campaign and that FECA's limits on spending by political parties are constitutional.

On remand, this court determined that factual evidence might be relevant to the issues yet to be determined and sent the case back to the district court for further proceedings. *See Federal Election Comm'n v. Colorado Republican Fed. Campaign*

*Comm.*, 96 F.3d 471 (10th Cir. 1996). The district court held the Act's limits on all spending by political parties facially invalid. *See Federal Election Comm'n v. Colorado Republican Fed. Campaign Comm.*, 41 F. Supp.2d 1197 (D. Colo. 1999). In so doing, the court referred to the material supplied by the FEC in support of the constitutionality of section 441a(d)(3) as lacking "any attention to elementary evidentiary requirements, such as authentication (Fed.R.Evid.901), or evidentiary limitations, such as the rule against hearsay (Fed.R.Evid.801)." *Id.* at 1200. Accordingly, the court "simply ignore[d] the mass of irrelevant and/or inadmissible evidence in the record and recite[d] facts which [it] regard[ed] as having some significance to the questions before the court." *Id.* at 1200-01. The court held that under the standard established by the Supreme Court, the FEC must demonstrate that the limit serves a compelling interest and is narrowly tailored. *Id.* at 1208. The court further held that the FEC had failed the test because it had offered no evidence of quid pro quo corruption, stating that mere access does not constitute corruption.

## II

While the appeal of this district court ruling was pending, the Supreme Court decided a case addressing contribution limits at the state level that were based on the "proposition that large contributions raise suspicions of influence peddling tending to undermine citizens' confidence 'in the integrity of . . . government.'"

*Nixon v. Shrink Missouri Gov't PAC*, 120 S. Ct. 897, 902 (2000) (quoting *Shrink Missouri Gov't PAC v. Adams*, 5 F. Supp.2d 734, 738 (E.D. Mo. 1998)). In upholding the contribution limits at issue, the Court addressed several issues relevant to the instant appeal. The Court's analysis thus requires more than the perfunctory nod given it by the majority.

In *Shrink Missouri* the Court addressed the standard applicable to a claim that a contribution limit violates the First Amendment and reiterated the line it had drawn in *Buckley* between limits on expenditures and limits on contributions as they impact speech rights. *Shrink Missouri*, 120 S. Ct. at 903. Significantly, as the majority grudgingly acknowledges, the Court reaffirmed and expanded on *Buckley*'s distinction

> between expenditure and contribution limitations *in their impacts on the association right.* While an expenditure limit "precludes most associations from effectively amplifying the voice of their adherents," (thus interfering with the freedom of the adherents as well as the association) the contribution limits "leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates."

*Id.* at 903-04 (citations omitted) (emphasis added). The Court reiterated and expressly applied to associational rights its holdings that "'restrictions on contributions require less compelling justification than restrictions on independent spending,'" *id.* at 904, and that "a contribution limit involving 'significant interference' with associational rights could survive if the Government

demonstrated that contribution regulation was 'closely drawn' to match a 'sufficiently important interest,'" *id.* (citations omitted).

The Court in *Shrink Missouri* also addressed the governmental interest furthered by contribution limits. The Court reiterated its prior cases holding that preventing corruption and the appearance of corruption are constitutionally sufficient to justify the abridgement of the associational right, pointing out that "[c]orruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves *or infusions of money into their campaigns*." *Shrink Missouri*, 120 S. Ct. at 905 (quoting *Federal Election Comm'n v. National Right to Work Comm.*, 459 U.S. 197, 208 (1982)) (emphasis added).

> In speaking of "improper influence" and "opportunities for abuse" in addition to "quid pro quo arrangements," we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors. These were the obvious points behind our recognition that the Congress could constitutionally address the power of money to "influence government action" in ways less "blatant and specific" than bribery.

*Id.* (quoting *Buckley*, 424 U.S. at 28). The Court observed that there is "no serious question" about the legitimacy of the governmental interest in preventing corruption and its appearance. *Id.*

The Court then addressed and rejected the lower court's conclusion that the state had "fail[ed] to justify the invocation of those interests with empirical

- 8 -

evidence of actually corrupt practices or of a perception among Missouri voters that unrestricted contributions must have been exerting a covertly corrosive influence." *Id.* at 906. The Court's discussion of the requisite evidentiary showing is directly relevant here in view of the majority's conclusion that the FEC has failed to meet its burden with respect to the contribution limit before us. The Court began its analysis by pointing out:

> The quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised. Buckley demonstrates that the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible. The opinion noted that "the deeply disturbing examples surfacing after the 1972 election demonstrate that the problem [of corruption] is not an illusory one."

*Id.* (quoting *Buckley*, 424 U.S. at 27 & n.28). The Court also rejected the argument that the evidentiary showing held sufficient in *Buckley* had subsequently been supplemented by a new requirement that the government "demonstrate that the recited harms are real, not merely conjectural." *Id.* at 907. In so doing, the Court distinguished between independent expenditure limits and contribution limits, implying that because limits on contributions are directly related to preventing corruption they may be assumed to be necessary absent convincing evidence to the contrary. *Id.*

The Court then set out the evidence supporting the contribution limit in that case, which did "not present a close call" requiring further definition of the state's

evidentiary obligation. *Id.* This evidence consisted of an affidavit from a state lawmaker stating that "large contributions have the real potential to buy votes," *id.* (internal quotation omitted), newspaper reports of large contributions, and anecdotal evidence, as well as a statewide vote indicating a public perception that limits were necessary. *Id.* at 907-08. The Court acknowledged that more extensive documentation might be needed if the state had made a showing

> to cast doubt on the apparent implications of Buckley's evidence and the record here, but the closest respondents come to challenging these conclusions is their invocation of academic studies said to indicate that large contributions to public officials or candidates do not actually result in changes in candidates' positions. . . . Given the conflict among these publications, and the absence of any reason to think that public perception has been influenced by the studies cited by respondents, there is little reason to doubt that sometimes large contributions will work actual corruption of our political system, and no reason to question the existence of a corresponding suspicion among voters.

*Id.* at 908.

### III

An evaluation of the majority's analysis in light of *Shrink Missouri* reveals that the majority opinion is replete with instances in which Congressional assessments and priorities are criticized and disregarded based on the majority's view of the role political parties should play in the American political process and how best to promote that role. The majority accepts, as it must, that the prevention of both corruption and the appearance of corruption is a legitimate justification for impinging on First Amendment rights. Nonetheless the majority essentially

eviscerates that interest by reweighing the balance struck by Congress in order to elevate what the majority believes to be the paramount interest political parties have in making unlimited coordinated contributions.

In my judgment, the majority has crossed the line between assessing the legal merits of a First Amendment challenge and imposing its own political judgments. A court owes "deference to a congressional determination of the need for a prophylactic rule where the evil of potential corruption had long been recognized." *Shrink Missouri*, 120 S. Ct. at 906 n.5. "Where a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments . . . ." *Id.* at 912 (Breyer, J., concurring). "[T]he legislature understands the problem–the threat to electoral integrity, the need for democratization–better than do we. We should defer to its political judgment that unlimited spending threatens the integrity of the electoral process." *Id.* at 913.

Rather than deferring, the majority substitutes its view for that of Congress and levels a broad-based attack on the contribution limit at issue. It concludes that the FEC has failed to provide adequate evidentiary support for the limit, that in imposing the limit Congress "gravely misunderst[ood] the role of political parties in our democracy," maj. op. at 22, that the provision cannot be supported as a necessary component in the overall regulatory scheme, and that the same result can

be obtained by the less intrusive reporting requirements of section 441a(a)(8).  In so doing, the majority requires an improperly demanding level of proof from the FEC to support a contribution limit the Supreme Court has told us is presumably justified.  The majority disregards evidentiary material expressly cited by the Court as sufficient to justify a contribution limit, yet relies on disputed academic articles of the type the Court expressly held insufficient to cast doubt on the validity of the justification.  Finally, by immunizing political parties from contribution limits designed to prevent corruption, the majority ignores the Court's directive that courts not "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared."  *Shrink Missouri*, 120 S. Ct. at 906 n.5.

The premise for the majority's result is its view of the "vital role" that political parties have played in the American system of government.  Maj. op. at 14.  While there is no doubt that parties play an important role in American politics, there is also ample support for the legislative determination that if left unchecked, parties can exert a corrupting influence on democratic processes or, equally importantly, appear to do so.[2]

---

[2] Significantly, the majority offers no evidence to the contrary beyond passages from law review articles which contain platitudes about the abstract value of parties in the American political process.

In formulating contribution limits, Congress did in fact recognize the role political parties play in American politics and accorded them special treatment by permitting them to make coordinated expenditures on behalf of their federal candidates far in excess of the limits imposed on others, s*ee* 2 U.S.C. § 441a(d)(1), and by permitting adjustment for inflation, *see id.* § 441a(c). Indeed, the majority cites the legislative history accompanying these provisions as evidence of Congressional recognition that parties play a unique role in the political process. *See* H.R. CONF. REP. NO. 94-1057, at 58-59 (1976), *reprinted in* 1976 U.S.C.C.A.N. 946, 973-74. However, other legislative material reveals that Congress wanted to ensure that "party assistance [would] actually represent[] the involvement of many voters and not merely the influence of a wealthy few." S.REP. NO. 93-689 (1974), *reprinted in* 1974 U.S.C.C.A.N. 5587, 5594. The FECA amendments of 1974 were intended to "prevent[] evasion of the individual contribution limits by persons funneling large gifts through party committees; each person's donation to party funds used to assist federal candidates under this special provision must not exceed the maximum amount he could give directly to a candidate." *Id.*

Significantly, these Congressional remarks appear in a discussion of legislation intended to strengthen political parties by promoting the pooling of resources from many small contributors, building coalitions of voters, keeping candidates responsible to the electorate, and increasing party resources for important

- 13 -

party operations between elections. *See id.* at 5593-94. Indeed, Amici Democratic Senatorial Campaign Committee and Democratic Congressional Campaign Committee argue persuasively that during the past twenty years political parties have recovered dramatically from a prolonged period of decline due in large part to the FECA provisions limiting contributions and expenditures, which in turn encourage parties to deploy their resources in other party-building functions that ultimately enhance their role in the political process. Whether one accepts this argument or not, it clearly illuminates the fact that determining which measures suitably balance the nurture of political parties and the prevention of their use as tools of corruption is a matter for the legislative rather than the judicial process.

The majority prefaces its analysis with a discussion voicing reservations on whether the standard set out in *Shrink Missouri* for assessing contribution limits should apply to political parties. *See* maj. op. at 12-13. Under that test, a contribution limit survives a First Amendment challenge if the Government demonstrates that it was closely drawn to match a sufficiently important interest. *Shrink Missouri*, 120 S. Ct. at 904. As an initial matter, the majority is simply mistaken in asserting that the Court in either *Buckley* or *Shrink Missouri* analyzed contribution limits more closely when they affected associational rights than when they affected speech rights. To the contrary, as discussed above, after setting out the *Buckley* analysis in the context of restraints on speech, the Court in *Shrink*

*Missouri* expressly stated that it had "flagged a similar difference between expenditure and contribution limitations in their impacts on the association right." *Id*. While recognizing that contribution limits have a greater impact on associational rights than on speech rights, the Court nonetheless reiterated its past holdings that expenditure and contribution limits are governed by differing standards even when they affect associational rights. *Id.* It is beyond quibble that the Court has drawn a distinction for purposes of First Amendment scrutiny between expenditures and contributions, rather than between associational and speech rights.

Moreover, there is no support in the Constitution, this legislation, or Supreme Court authority for the majority's notion that political parties are entitled to favored treatment when assessing a contribution limit that impacts their associational rights. The majority supports its position by stating that "a party speaks in large part through its identified candidates."[3] Maj. op. at 12. The same can be said, however, of any entity seeking to associate itself with a political candidate. That fact therefore does not serve to set political parties apart from others subject to contribution limits. More importantly, the Supreme Court has expressly rejected the argument that a party and its candidate are identical: "We cannot assume . . . that this is so. Congress chose to treat candidates and their parties quite differently

---

[3] In focusing on the speech a party can allegedly only make through its candidate, the majority blurs the very line it wishes to draw between limits on speech and limits on associational rights.

- 15 -

under the Act, for example, by regulating contributions from one to the other."

*Colorado Republican Comm.*, 518 U.S. at 623-24 (citation omitted). The Supreme

Court and Congress have thus foreclosed the very assumption made by the majority

here.

In holding the contribution limit at issue unconstitutional, the majority

requires the FEC to provide evidence in support of Congress' determination that

political parties corrupt or appear to corrupt the political process through unlimited

contributions.[4] The Supreme Court addressed the quantum of evidence required to

support this interest in *Shrink Missouri*, and its discussion there cannot be squared

with the majority's treatment of the matter here. The Court pointed out that the

necessary evidentiary showing "will vary up or down with the novelty and

plausibility of the justification raised," and that "the dangers of large, corrupt

contributions and the suspicion that large contributions are corrupt are neither novel

nor implausible." *Shrink Missouri*, 120 S. Ct. at 906. Because the legitimacy of the

interest is thus so critical to the evidence required, the relevant inquiry is whether

the Court's discussion in *Shrink Missouri* of the well-recognized dangers of large

---

[4] In addition, the majority requires that Congress' determination be analyzed in light of the vital role political parties play in that process. As I have discussed in text, Congress was clearly aware of the role parties play in the political process, and it enacted measures aimed at promoting that role as well as strengthening parties in general. The majority thus "double counts" the importance of protecting political parties and improperly substitutes its balancing of the competing values at issue here for that of Congress.

- 16 -

contributions applies when those contributions are from political parties rather than from other donors.

In *Shrink Missouri,* the lower court accepted the argument that the State had not justified the invocation of this interest with empirical evidence of actually corrupt practices or the public perception of a corrupting influence. The Supreme Court disagreed and expanded on the dangers flowing from large contributions generally.

> In speaking of "improper influence" and "opportunities for abuse" in addition to "quid pro quo arrangements," we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors. These were the obvious points behind our recognition that the Congress could constitutionally address the power of money "to influence governmental action" in ways less "blatant and specific" than bribery.

*Shrink Missouri*, 120 S. Ct. at 905 (quoting *Buckley*, 424 U.S. at 28). The Court pointed out:

> Even without the authority of Buckley, there would be no serious question about the legitimacy of the interests claimed, which, after all, underlie bribery and anti-gratuity statutes. While neither law nor morals equate all political contributions, without more, with bribes, we spoke in Buckley of the perception of corruption "inherent in a regime of large individual financial contributions" to candidates for public office, as a source of concern "almost equal" to quid pro quo improbity. The public interest in countering that perception was, indeed, the entire answer to the overbreadth claim raised in the Buckley case. This made perfect sense. Leave the perception of impropriety unanswered, and the cynical assumption that large donors call the tune could jeopardize the willingness of voters to take part in democratic governance. Democracy works "only if the people have faith in those who govern, and that faith is bound to be shattered when high officials and their

appointees engage in activities which arouse suspicions of malfeasance and corruption."

*Id.* at 905-06 (citations omitted).

The FEC contends that these concerns apply equally to large contributions from political parties, arguing that parties can use their ability to funnel large amounts into the campaigns of particular candidates in response to large donations by outside interests, to assist in the evasion of contribution limits placed on individual and political committee contributions, and to promote the personal interests of party leaders, their friends, and party factions. The FEC's position voices long-standing Congressional concerns that have animated the history of efforts to reform federal election financing, many of which were addressed to the evils arising from large contributions to political parties that put the parties in political debt to the donors, debts which were often paid by the parties' candidates. In *United States v. International Union UAW-CIO*, 352 U.S. 567 (1957), for example, the Supreme Court addressed the circumstances giving rise to the Corrupt Practices Act, 18 U.S.C. § 610, which prohibited corporations and labor unions from making contributions or expenditures in connection with federal elections. The Court found the following legislative history indicative of Congressional intent to "protect the political process from what it deemed to be the corroding effect of money employed in elections by aggregated power," *id.* at 582:

> We all know . . . that one of the great political evils of the time is the apparent hold on political parties which business interests and certain organizations seek and sometimes obtain by reason of liberal campaign contributions. Many believe that when an individual or association of individuals makes large contributions for the purpose of aiding candidates of political parties in winning the elections, they expect, and sometimes demand, and occasionally, at least, receive, consideration by the beneficiaries of their contributions which not infrequently is harmful to the general public interest. It is unquestionably an evil which ought to be dealt with, and dealt with intelligently and effectively.

*Id.* at 576-77 (quoting remarks by "Senator Robinson, one of the leaders of the Senate"). "We all know that money is the chief source of corruption. We all know that large contributions to political campaigns . . . put the political party under obligation to the large contributors, who demand pay in the way of legislation . . . ." *Id.* at 577-78 (quoting Senator Bankhead offering 1940 amendments to the Hatch Act restricting contributions to federal elections).

> One of the matters upon which I sensed that the public was taking a stand opposite to that of labor leaders was the question of the handling of funds of labor organizations. The public was aroused by many rumors of . . . political contributions to parties and candidates which later were held as clubs over the head of high Federal officials.

*Id.* at 579 (quoting Congressman Landis, author of 1943 measure extending sections of Corrupt Practices Act to labor unions). These remarks, all of which were made by federal legislators during the efforts to pass earlier campaign finance reform, establish that the dangers from large contributions by political parties are no more novel or implausible than those from large contributions generally.

- 19 -

The Court's analysis of the quantum of evidence presented in *Shrink Missouri* governs the inquiry here. In concluding that the evidentiary showing in that case was sufficient to justify the contribution limits challenged there, the Court cited an affidavit from a state legislator stating generally that large contributions have the potential to buy votes, and "newspaper accounts of large contributions supporting inferences of impropriety." *Shrink Missouri*, 120 S. Ct. at 907. Although the majority largely ignores the record before us, it likewise contains affidavits and depositions from those who have been active in federal fund raising activities, both as candidates and as party activists. These materials state that large donors to political parties give with an eye toward obtaining favorable consideration of legislation they deem important or obtaining access to a legislator in order to urge favorable action. *See*, *e.g.*, Decl. of Robert Hickmott (DNC fundraiser), jt. app. at 452-53; Aff. of Robert Razen (staff person for Senator George Mitchell), *id.* at 462; Aff. of Former Senator Paul Simon, *id.* at 466; Decl. of Former Senator Timothy Wirth, *id.* at 545-46; Dep. of Paul Simon, *id.* at 636; Dep. of Timothy Wirth, *id.* at 649, 661. *See also* Fax from National Republican Senatorial Comm., *id.* at 626. The record also reveals that although earmarking funds for a particular candidate is illegal, this prohibition is circumvented through "understandings" regarding what donors give what amounts to the party, which candidates are to receive what funds from the party, and what interests particular donors are seeking to promote. *See*,

*e.g.*, Decl. of Leon G. Billings (former Exec. Dir. of Dem. Sen. Campaign Comm.), *id.* at 382; Decl. of Robert Hickmott (DNC fundraiser), *id.* at 446-48; Aff. of Paul Simon, *id.* at 465; Decl. of Timothy Wirth, *id.* at 543; Dep. of Timothy Wirth, *id.* at 644-45.

Senators are expected to encourage their major donors, who have maximized their contribution to the candidate, to make contributions to the state or national party, which in turn gives the candidates money for their campaigns. *See, e.g.*, Decl. of Leon G. Billings, *id.* at 382-83; Decl. of Robert Hickmott, *id.* at 446-47; Aff. of R. William Johnstone (staff person for Senator Wysche Fowler, Jr.), *id.* at 457; Decl. of Timothy Wirth, *id.* at 543; Dep. of Paul Simon, *id.* at 635. *See also* Letter from Congressman Wayne Allred, *id.* at 191. Former Senator Simon candidly admitted, "I have found the process to be corruptive for everyone and, even those of us who go out of our way to make sure money does not influence our decision, we are affected by it." *Id.* at 630; *see also id.* at 640 (noting one colleague saying bluntly, "We have to pay attention to who is buttering our bread.").

In addition, the record contains numerous media articles and interviews reporting on episodes in which the inference can be drawn that donations to a party brought about access to that party's candidates and legislators, which in turn

furthered the donor's business interests.[5]  *See generally id.* at 250-89.  Given the

Supreme Court's reliance on this very type of evidence in *Shrink Missouri*, I believe

that we are required to credit it here and to hold that the FEC has indeed carried its

---

[5] Despite the Court's explicit reliance on newspaper articles in *Shrink Missouri*, the majority here refuses to accord them any weight in addressing the Congressional goal of preventing public perception of corruption.  The majority states that "media accounts documenting a vague (though visceral) public cynicism about campaign finance prove too little.  We should not allow generic public dissatisfaction to support the restriction of political speech."  Maj. op. at 21 n.6.  In so doing, the majority mischaracterizes and then ignores the significance of the media material here, and fails to accord any weight to the public interest in countering the perception of impropriety, which the Supreme Court has described "as a source of concern 'almost equal' to quid pro quo improbity."  *Shrink Missouri*, 120 S. Ct. at 905-06 (quoting *Buckley*, 424 U.S. at 30).

Significantly, the Supreme Court authority upon which the majority relies was directed to evaluating limits on *independent* expenditures, which the Court has emphatically distinguished from coordinated expenditures.

> [T]he constitutionally significant fact . . . is the lack of coordination between the candidate and the source of the expenditure.  This fact prevents us from assuming, absent convincing evidence to the contrary, that a limitation on political parties' *independent* expenditures is necessary to combat a substantial danger of corruption of the electoral system.

*Colorado Republican Capaign Comm.*, 518 U.S. at 617-18 (citing *Buckley*, 424 U.S. at 45-46; *Federal election Comm'n v. National Conservative Political Action Comm.*, 470 U.S. 480, 498 (1985)).  When, as here, this constitutionally significant fact is missing and the expenditure is instead *coordinated*, the Court has clearly indicated that a substantial danger of corruption may be assumed absent convincing evidence to the contrary.  The majority thus errs in placing the burden on the FEC rather than on the Colorado Republican Party, which certainly has not shouldered that burden in this case.

- 22 -

evidentiary burden to support the legislative judgment that party contribution limits are necessary to prevent corruption and the appearance of corruption.

The majority opinion's several responses to the evidence offered by the FEC all run afoul of Supreme Court authority. First, the majority begins on the wrong foot in relying on a statement by the plurality opinion in *Colorado Republican Fed. Campaign Comm.* that it was "'not aware of any special dangers of corruption associated with political parties.'" Maj. op. at 15 (quoting *Colorado Republican Fed. Campaign Comm.*, 518 U.S. at 616). This remark was not directed to contribution limits on party donations. Rather, it referred to limits on a party's *independent* expenditures which, unlike contributions, are not deemed to be coordinated and therefore pass constitutional muster due to the absence of prearrangement and coordination. *Id.* This statement is simply inapposite to coordinated party contributions. *Cf.*, *Shrink Missouri*, 120 S. Ct. at 907 (making same point about *Colorado Republicans Fed. Campaign Comm.* with respect to government's evidentiary burden).

Next the majority takes issue with Congress' decision to limit party contributions as a means of addressing the ability of corporations and other big donors to influence the legislative process. Here, too, the majority acts contrary to the admonition in *Shrink Missouri* that courts are not to "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil

feared." 120 S. Ct. at 906 n.5. "Where a legislature has significantly greater institutional expertise, as, for example, in the field of election regulation, the Court in practice defers to empirical legislative judgments . . ." *Id.* at 912 (Breyer, J., concurring). Given the legitimacy of the goal of preventing corruption and the undeniable fact that parties funnel funds from donors to candidates when they coordinate expenditures, the Supreme Court has made clear that we are not at liberty to replace Congress' judgment on an effective means for furthering its interest. *See Buckley*, 424 U.S. at 30 (court "has no scalpel" to probe Congressional choice of means to accomplish necessary end).

The majority also rejects the FEC's argument that limits on party contributions are necessary to prevent unscrupulous party officials from furthering their pet interests, thereby corrupting or appearing to corrupt the legislative process. The majority posits that in adopting this theory, Congress "gravely misunderstands the role of political parties in our democracy." Maj. op. at 22. *As a matter of common sense, it is difficult to credit the bald assertion that politicians do not understand the role political parties play in American politics.*[6] Moreover, the

---

[6] The majority apparently concedes the problem in accusing Congress of failing to understand the political process, and attempts to shift the focus of its criticism from Congress to the FEC, asserting that the FEC misunderstands Congressional intent in defending limits on coordinated party spending as a means of combating corruption. *See* Maj. Op. at 22 n. 7. The Supreme Court language in *Colorado Republican Campaign Comm.*, upon which the majority relies, however, is found in its discussion of limits on *independent* party expenditures.

- 24 -

majority is not at liberty to substitute its judgment for that of Congress on how best to balance the need to promote the role of political parties and to combat its potential for corruption. The majority also views the electoral and litigation processes as the proper means for righting the wrongs perpetrated by corrupt party leaders, again displacing the judgment of Congress on matters uniquely within its province.

Finally, the majority rejects the argument that limits on party expenditures are necessary to prevent evasion of the Act's other contribution limits. The majority believes that enforcement of the disclosure requirements in section 441a(a)(8) is adequate to protect against this problem. To the contrary, the Supreme Court has made it unmistakably clear that the existence of disclosure requirements is not a ground for invalidating contribution limits.

> We specifically rejected this notion in Buckley, where we said . . . that "Congress was surely entitled to conclude that disclosure was only a partial measure, and that contribution ceilings were a necessary legislative concomitant to deal with the reality or appearance of corruption inherent in a system permitting unlimited financial contributions, even when the identities of the contributors and the amounts of their contributions are fully disclosed." We understood

---

*See* 518 U.S. at 616-18. As I have previously pointed out, *see supra* at 22-23 n.5, the Court in that discussion specifically distinguished independent party spending from coordinated spending on the basis of the "constitutionally significant" "lack of coordination." 518 U.S. at 617. The majority relies on selective quotations and simply ignores the fact that the Supreme Court analyses in which these quotes occur is grounded on the very distinction that renders the majority's reliance invalid.

contribution limits, on the other hand, to "focu[s] precisely on the problem of large campaign contributions–the narrow aspect of political association where the actuality and potential for corruption have been identified–while leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." There is no reason to view contribution limits any differently today.

*Shrink Missouri*, 120 S. Ct. at 908 n.7 (citations omitted).

In sum, the majority has substituted a paean to its view of the role of political parties for a properly deferential assessment of the constitutionality of limits on coordinated party contributions under applicable Supreme Court authority. The result the majority reaches simply cannot be reconciled with that authority.

In my view, section 441a(d) is unquestionably valid under the analysis in *Shrink Missouri* and prior Supreme Court authority. The FEC has amply supported its argument that limits on coordinated expenditures by political parties serve the public interest in preventing both corruption and the appearance of corruption by limiting the leverage parties possess to pay off the political debts owed to large contributors. The FEC has offered evidence that the access purchased by large donations translates into power which distorts the democratic process. Both common sense and experience dictate that the public justifiably views the access obtained by large donations as the unfair opportunity to gain a candidate's support on the basis of financial considerations rather than on policy or belief. The FEC has also supported its contention that the limits at issue are an integral part of FECA's

regulatory scheme because they prevent donors from evading the limits on contributions to a candidate by contributing to political parties with the understanding, tacit or otherwise, that the funds will be used for that candidate. Finally, the majority's conclusion that the limit here is not narrowly drawn rings hollow in light of the Court's earlier holding in this case that parties may make *independent* expenditures on behalf of a candidate.

I see no merit to the assertion that the political atmosphere has changed to the extent that the limits at issue are no longer needed. This evaluation, like so many of the others made by the majority in this case, is to be made by Congress through the legislative process and not by us through judicial fiat. Neither the majority nor the Committee has made a persuasive argument that human nature has changed in the twenty years that have passed since FECA was enacted. To the extent that the political process has in fact improved, FECA has played a major role in the curtailment of abuses. Eliminating an integral part of the Act would allow those abuses to flourish once again. The fact that FECA has accomplished what it was meant to do is hardly a justification for doing away with it. In holding to the contrary, the majority makes a grave error by turning a deaf ear to the voices of history that advise us to learn from our mistakes lest we repeat them.

Accordingly, I dissent.