5 F.Supp.2d 734 (1998)
SHRINK MISSOURI GOVERNMENT PAC, et al., Plaintiffs,
v.
Richard ADAMS, et al., Defendants.
No. 4:98CV357 CDP.
United States District Court, E.D. Missouri, Eastern Division.
May 12, 1998.
Douglas Bruce La Pierre, St. Louis, MO, Patric A. Lester, Lester and Associates, St. *735 Louis, MO, for Shrink Missouri Government PAC.
James R. Layton, Paul Maguffee, Attorney General of Missouri, Assistant Attorney General, Jefferson City, MO, for Richard Adams, Patricia Flood, Robert Gardner, Ervin Harder, John Howald, Elaine Spielbusch, Jeremiah W. Nixon.
Andrew J. Minardi, Sr. Assoc. Cty. Counsel, Patricia J. Redington, Assoc., Cty. Counselor, St. Louis County Counselor Office, Clayton, MO, for Robert P. McCullough.
Gerald P. Greiman, Dankenbring and Greiman, Clayton, MO, for Joan Bray.

MEMORANDUM AND ORDER
PERRY, District Judge.
This case draws into question the validity of Missouri's limits on contributions to candidates for state elected office. Contending that those limits violate their first amendment rights, plaintiffs seek an injunction preventing enforcement of the following provisions of Senate Bill 650, codified at Mo. Ann. Stat. § 130.032 (West Supp.1998):
1. Provisions that limit "the amount of contributions made by or accepted from any person other than the candidate in any one election" to a maximum of (a) $1,075.00 to elect an individual to the offices of governor, lieutenant governor, secretary of state, state treasurer, state auditor, or attorney general, or any other office if the population of the relevant electoral unit is at least 250,000, (b) $525.00 to elect an individual to the office of state senator or any other office if the population of the relevant electoral unit is at least 100,000 but less than 250,000, (c) $275.00 to elect an individual to the office of state representative or any other office if the population of the relevant electoral unit is less than 100,000. See Mo. Ann. Stat. § 130.032.1.
2. A provision adjusting the above-mentioned limits for inflation. Mo. Ann. Stat. § 130.032.2.
3. A provision making "candidate committees, exploratory committees, campaign committees and continuing committees, other than those continuing committees which are political party committees" subject to the above-mentioned limits. Mo. Ann. Stat. § 130.032.3.
4. A provision imposing on committees found in violation of the above-mentioned limits a penalty of an amount equal to the nonallowable contribution plus a $1,000 surcharge per such nonallowable contribution. Mo. Ann. Stat. § 130.032.7.
On March 4, 1998, the Court heard oral argument from all parties on plaintiffs' motion for a temporary restraining order. The Court denied the motion on March 9, concluding that on the record before it, plaintiffs had failed to show a likelihood of success on the merits or that the balance of harms and public interest weighed in their favor. See Dataphase Sys., Inc. v. C L Sys., 640 F.2d 109 (8th Cir.1981) (en banc).
On March 18, the Court entered a case management order. In that order, the Court, generally adopting a proposal jointly submitted by the parties, established an expedited briefing schedule for dispositive motions. In accordance with that schedule, the parties have filed cross-motions for summary judgment. Based on the undisputed facts and the relevant case law, the Court concludes that defendants are entitled to judgment as a matter of law. It will enter judgment accordingly, and will deny plaintiffs' motion for injunctive relief.[1]

I. Background

This action comes as the perhaps inevitable consequence of the Eighth Circuit's 1995 decision in Carver v. Nixon, 72 F.3d 633 (8th *736 Cir.1995), cert. denied, 518 U.S. 1033, 116 S.Ct. 2579, 135 L.Ed.2d 1094 (1996), a case that invalidated the campaign contribution limits contained in Proposition A, an initiative passed by the Missouri electorate in the November 1994 election. Proposition A placed "per election cycle"[2] limits on contributions by individuals or committees (other than candidate committees) to a candidate or his or her candidate committee. Those limits were as follows: (1) $100 per candidate in districts with fewer than 100,000 residents, (2) $200 per non-statewide candidate in districts of 100,000 or more residents, and (3) $300 per statewide candidate (i.e., candidates seeking election to the office of Governor, Lieutenant Governor, Attorney General, Auditor, Treasurer, and Secretary of State).
Prior to the November 1994 election, the Missouri General Assembly enacted a campaign finance law, known as Senate Bill 650, which contained the campaign contribution limits set forth in the first paragraph of this memorandum. Senate Bill 650's limits were to take effect on January 1, 1995. After Proposition A's passage, however, the Missouri attorney general determined that the initiative's lower limits controlled.
Following the attorney general's determination, Carver, a political contributor, brought suit to enjoin Proposition A's enforcement, arguing that the law unconstitutionally interfered with his ability to support political candidates. The district court denied the injunction, Carver v. Nixon, 882 F.Supp. 901 (W.D.Mo.1995), and the Eighth Circuit reversed. The court of appeals concluded that the district court had erred in extending the Supreme Court's holding in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), "to the infinitely broader interest of limiting all, not just large, campaign contributions."[3] 72 F.3d at 639. Quoting the Supreme Court's decision in Citizens Against Rent Control v. Berkeley, 454 U.S. 290, 102 S.Ct. 434, 70 L.Ed.2d 492 (1981), the court stated, "`Buckley identified a single narrow exception to the rule that limits on political activity were contrary to the First Amendment. The exception relates to the perception of undue influence of large contributors to a candidate ....'" Carver, 72 F.3d at 638 (quoting 454 U.S. at 296, 102 S.Ct. 434) (emphasis added by the Carver court).
Describing Proposition A's limits as "dramatically lower" than those approved in Buckley, id. at 641-42, and lower, in fact, than those of any other state, id. at 642, the Carver court concluded that the initiative's limits were "not closely drawn to reduce corruption or the appearance of corruption associated with large campaign contributions." Id. at 644. The court found the following factors relevant: (1) after adjusting for inflation, Proposition A's limits represented between two and six percent of the $2,000 per election cycle limit approved of in Buckley, id., at 642 n. 8,[4] (2) other states had larger contribution limits, id. at 641-42, (3) *737 Senate Bill 650 provided a "back-up" in the event of Proposition A's invalidation, id. at 642 ("The question is not simply that of some limits or none at all, but rather Proposition A as compared to those in Senate Bill 650 ...."),[5] and (4) the impact of Proposition A's limits affected a much higher percentage of contributors than did the federal $1,000 limit. Id. at 643. As a result of the Carver decision, Proposition A's limits were supplanted by those contained in Senate Bill 650.

II. Facts

Plaintiff Shrink Missouri Government PAC ("Shrink PAC") is a political action committee. Plaintiff Zev David Fredman is a candidate in the August 1998 Republican primary for the office of Missouri state auditor. Fredman, who has never before run for statewide political office, has formed a candidate committee ("Fredman for Auditor"), filed for office, and paid the required filing fee. The defendants in this matter are the Missouri Ethics Commission's chairman (John Howald) and members (Richard Adams, Patricia Flood, Robert Gardner, Ervin Harder, and Elaine Spielbusch), who are responsible for administering the provisions of the Missouri campaign finance laws, the state attorney general (Jeremiah W. Nixon), who advises the ethics commission and enforces the campaign finance laws, and the prosecuting attorney of St. Louis County (Robert P. McCullough), who is also responsible for enforcing those laws.
Shrink PAC raises money from Missouri voters and contributes those funds to candidates for Missouri elective office. It made contributions to certain of those candidates in the 1994, 1996, and 1997 elections. On June 23, 1997, it made a $1,025 contribution to "Fredman for Auditor," and made an additional $50 contribution on February 25, 1998. Shrink PAC states that but for Missouri's campaign contribution limitations, it would make additional contributions to Fredman's campaign. Fredman believes that he can wage an effective campaign for auditor only if he can garner contributions in excess of those provided for under current Missouri law.

III. Discussion

In determining whether summary judgment should issue pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court views the facts and any inferences to be drawn therefrom in the light most favorable to the nonmoving party. The moving party bears the burden of both establishing the absence of a genuine issue of material fact and showing that it is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). In this case, the facts are undisputed. The issue is purely legal: do Missouri's limits on campaign contributions violate the first amendment?
It is firmly settled that regulation of first amendment rights is "always subject to exacting judicial review." Citizens Against Rent Control, 454 U.S. at 294, 102 S.Ct. 434. "Exacting review" means "strict scrutiny." A court must strike a challenged regulation that is not "narrowly tailored to achieve a compelling governmental interest." McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 347, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995); Carver, 72 F.3d at 638.
Plaintiffs argue that defendants must demonstrate that campaign contributions in excess of the statutory limits cause some "real harm," i.e., that such contributions cause either corruption or the appearance of corruption. If a showing of "real harm" is required (the state claims it is not), the Court finds that defendants here have made that showing.
"A State indisputably has a compelling interest in preserving the integrity of its election process." Eu v. San Francisco Cty. Democratic Central Comm., 489 U.S. 214, *738 231, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989). Defendants claim that contributions exceeding the statutory limits create a perception that the individuals or entities making those contributions are attempting to curry favor with the state's elected officials. Eliminating or at least limiting that perception is a compelling governmental interest, as Buckley makes clear. See Buckley, 424 U.S. at 27, 96 S.Ct. 612. As Missouri does not collect or preserve legislative history, it is obviously impossible for defendants to supply a contemporaneous account of the reasoning and motivations behind Senate Bill 650. They have, however, provided evidence in the form of an affidavit from the state senator who co-chaired the Interim Joint Committee on Campaign Finance Reform at the time of Senate Bill 650's passage. In that affidavit, the senator stated that the committee "heard testimony on and discussed the significant issue of balancing the need for campaign contributions versus the potential for buying influence." He further testified to his belief that contributions in excess of the limits set by Missouri "have the appearance of buying votes as well as the real potential to buy votes."[6]
A perception of influence peddling is "real harm" regardless of whether such peddling is actually afoot. Buckley, 424 U.S. at 27, 96 S.Ct. 612 ("Of almost equal concern as the danger of actual quid pro quo arrangements is the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large financial contributions."). To the extent Citizen Smith thinks that an elected official is giving Citizen Jones preferential treatment based on the latter's largess in the most recent election, the confidence of Citizen Smith in the integrity of her government is diminished. The Court does not believe that polling the citizenry is required in order to demonstrate that the integrity of a state's election process is facing a perceived threat.[7] As the recipients of campaign contributions, members of the legislature are uniquely qualified to gauge whether allowing those contributions to go unchecked endangers our democratic system of government, and, if so, to prescribe an appropriate remedy therefor. As the Supreme Court has observed, "Sound policymaking often requires legislators to forecast future events and to anticipate the likely impact of these events based on deductions and inferences for which complete empirical *739 support may be unavailable." Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); see also Munro v. Socialist Workers Party, 479 U.S. 189, 195-96, 107 S.Ct. 533, 93 L.Ed.2d 499 (1986) ("Legislatures, we think, should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights."); Bullock v. Carter, 405 U.S. 134, 145, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972) ("Although we have no way of gauging the number of candidates who might enter primaries in Texas if access to the ballot were unimpeded by the large filing fees in question here, we are bound to respect the legitimate objectives of the State in avoiding overcrowded ballots."). Even for one unschooled in politics, no great deductive leap is required to reach a conclusion that the contribution of substantial sums to a candidate for political office gives rise to a perception among the public that the contributor is trying to curry favor with the recipient.[8]See Turner Broad., 512 U.S. at 666, 114 S.Ct. 2445 ("`[W]hen trenching on first amendment interests ..., the government must be able to adduce either empirical support or at least sound reasoning on behalf of its measures.'") (quoting Century Communications Corp. v. F.C.C., 835 F.2d 292, 304 (D.C.Cir.1987)); Burson v. Freeman, 504 U.S. 191, 207, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992) (describing the link between ballot secrecy and a restriction on the display or distribution of campaign materials near polling places as one of "common sense"). Plaintiffs' contention that defendants have not shown "real harm" must fail.
Plaintiffs appear to be implying that the Supreme Court's decision in Buckley no longer sits on a firm foundation. But, the case upon which plaintiffs most heavily rely, Colorado Republican Fed'l Campaign Comm. v. Federal Election Comm'n, 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996), simply does not support that proposition. The Court in Colorado Republican held that the first amendment prohibits applying a federal statutory limit on a political party's expenditures made "in connection with" a general election congressional campaign to a political party's expenditure that is made without coordination with any candidate. 116 S.Ct. at 2312. In announcing its decision, the Court issued four separate opinions: Justice Breyer announced the Court's judgment and authored an opinion joined by Justices O'Connor and Souter; Justice Kennedy (joined by Chief Justice Rehnquist and Justice Scalia) wrote an opinion concurring in the judgment and dissenting in part; Justice Thomas (joined, in part, by Chief Justice Rehnquist and Justice Scalia wrote a separate opinion concurring in the judgment and dissenting in part); and Justice Stevens (joined by Justice Ginsburg) filed a dissenting opinion. All four authors discussed Buckley, and three of them (representing a total of eight justices) implicitly endorsed its holding. See id. 116 S.Ct. at 2315 ("Beginning with Buckley, the Court's cases have found a `fundamental constitutional difference between money spent to advertise one's views independently of the candidate's campaign and money contributed to the candidate *740 to be spent on his campaign.") (opinion by Breyer, J.); id. 116 S.Ct. at 2321 ("[I]t is true that contributions can be restricted consistent with Buckley....") (opinion by Kennedy, J.); id. 116 S.Ct. at 2332 ("It is quite wrong to assume that the net effect of limits on contributions ... will be adverse to the interest in informed debate protected by the First Amendment.") (opinion by Stevens, J.). Only Justice Thomas, in a section of his opinion that neither Chief Justice Rehnquist nor Justice Scalia joined, urged that Buckley be overruled. Id. 116 S.Ct. at 2325 (expressing belief that the distinction between expenditures and contributions "lacks constitutional significance") (opinion by Thomas, J.). In sum, then, Buckley's holding is still sound.
Plaintiffs also argue that Missouri's campaign contribution limits are not "narrowly tailored." As mentioned above, the Eighth Circuit in Day strongly implied that the impact of inflation should be taken into account in determining whether a given limit on campaign contributions passes first amendment muster. See 34 F.3d at 1366. Carver reiterated that concern: "Our observation in Day about the effect of inflation applies with equal force in this case." 72 F.3d at 641. Citing those two decisions, plaintiffs claim that contribution limits must be adjusted for inflation, and that, so adjusted using the Consumer Price Index ("CPI"), $1,075 today is the equivalent of only $378 in 1976.[9]
In holding that a $100 limit on contributions to and from political committees was "too low to allow meaningful participation in protected political speech and association," 34 F.3d at 1366, the court in Day noted that the $1,000 ceiling upheld in Buckley was not a "constitutional minimum," id., a statement which Buckley emphatically supports. As the Buckley Court observed, "The quantity of communication by the contributor does not increase perceptibly with the size of his contribution. ... At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate." 424 U.S. at 21, 96 S.Ct. 612. As noted supra, the Court rejected a claim that the $1,000 ceiling was overly broad in that "much more than that amount would still not be enough" for an unscrupulous contributor to exercise improper influence. Id. at 30, 96 S.Ct. 612. Quoting the D.C. Circuit's opinion in Buckley, the Court stated, "`[i]f it is satisfied that some limit on contributions is necessary, a court has no scalpel to probe whether, say, a $2,000 ceiling might not serve as well as $1,000.'" Id. at 30, 96 S.Ct. 612 (quoting 519 F.2d at 842). The Court concluded, "Such distinctions in degree become significant only when they can be said to amount to differences in kind." Id. A "difference in kind" might arise, the Court suggested, if the limitation at issue "prevented candidates and political committees from amassing the resources necessary for effective advocacy." Id. 424 U.S. at 21, 96 S.Ct. 612. In approving FECA's contribution ceiling, the Court noted that it did not reduce "the total amount of money potentially available to promote political expression," id. at 22, 96 S.Ct. 612, but, instead, "merely ... require[d] candidates and political committees to raise funds from a greater number of persons and to compel [would-be big donors] to expend [their] funds on direct political expression." Id.
The Court finds that the effect of inflation since Buckley was decided has not created a "difference in kind" between a $1,000 contribution in 1976, and a $1,075 contribution in 1998.[10] First, the evidence shows that despite Missouri's contribution limits, candidates for state elected office are still quite able to raise funds sufficient to run effective campaigns. For example, in the 1992 race for secretary of state, expenditures by the seven candidates totaled $646,749.53 (including both the primary and the general elections). In the 1996 race for that office, the three candidates spent a total of $1,819,025.69. *741 Likewise, in the 1992 race for lieutenant governor, the six candidates spent $1,974,066.33, as compared to the $1,001,219.08 spent by the two candidates for the same office in 1996. Despite Missouri's contribution limits, candidates for political office in the state are still able to amass impressive campaign war chests.[11]
In striking the $100 contribution limit at issue in Day, the Eighth Circuit expressed concern that between one-fourth and one-third of the contributions made by one of the plaintiffs therein exceeded that amount in the most recent election cycle. 34 F.3d at 1366. Similarly, in Carver, the court observed that "in the 1994 Auditor's race, 19.5 percent of the contributors gave more than the $300 Proposition A limit, but less than the $1,000 Senate Bill 650 limit," and that "in the State Representative race, 19.0 percent of the contributors gave more than the $100 Proposition A limit, but less than the $250 Senate Bill 650 limit." 72 F.3d at 643; see also Buckley, 424 U.S. at 21 n. 23 ("Statistical findings agreed to by the parties reveal that approximately 5.1% of the $73,483,613 raised by the 1,161 candidates for Congress in 1974 was obtained in amounts in excess of $1,000."). According to data produced by defendants, of the 1,973 contributors to candidates for state auditor in the 1994 general election, 1,926 (or 97.62 percent) made aggregate contributions of $2,000 or less. Only forty-seven of the 1,973 (or 2.38%) made aggregate contributions of more than $2,000. Similarly, in the 1992 general election for secretary of state, less than 1.5% of the contributors made aggregate contributions exceeding $2,000. Thus, there is no reason to believe that Missouri's contribution limits have any "dramatic adverse effect" on funding campaigns for state office.[12]See id. 424 U.S. at 21, 96 S.Ct. 612.
Last but not least, the Court does not believe that invalidating Missouri's contribution limits would be consistent with Buckley. It is clear from Eighth Circuit precedent that Buckley controls the issues in this case. See Carver, 72 F.3d 633. And it is also clear, plaintiffs' suggestions to the contrary notwithstanding, that Buckley remains good law. Therefore, to hold that in the context of contribution limits on state elections, the monetary limits approved of in Buckley are invalid would, in the Court's view, constitute *742 an indirect  but still improper  overruling of that decision. Missouri's statute, unlike FECA, already does take inflation into account. It specifically requires that the contribution limits prescribed therein "shall be increased on the first day of January in each even-numbered year by multiplying the base year amount [defined as the contribution limits effective on January 1, 1995] by the cumulative consumer price index ... for all years since January 1, 1995."[13] Mo.Rev.Stat. § 130.032.2. Does the Constitution require Missouri to do more, especially given that FECA contains no provision adjusting for inflation the limits approved of in Buckley? The Court believes the answer to that question is no.
Certainly, taking account of inflation makes economic sense in theory, but it may be substantially more difficult in practice. For example, is using the CPI really the appropriate method? After all, the CPI cannot, by definition, reflect increases in the cost of non-consumer services such as conducting a mass-mailing, operating a telephone bank, or running a thirty-second radio or television advertisement. And if some or all of those costs have risen, perhaps they are offset, at least to some degree, by post-1976 technological advances such as the fax machine, e-mail, and the Internet (a candidate might, for example, be able to cheaply and effectively promulgate his or her views by creating a web page). Should not such cost-reducing innovations affect the inflation calculus?
The Court further observes that neither the Day panel nor the Carver panel held that inflation was the only factor to be considered. Indeed, because the state's "compelling interest" encompasses a desire to avoid even the perception of corruption, it might well be pertinent to inquire whether the average Missourian views $1,000 as a large or small amount. In this regard, the Court notes that the median income of a Missouri household in 1994 was $31,046, an amount that, in constant 1995 dollars, was actually less than it had been nine years earlier ($31,073 in 1985). See Statistical Abstract of the United States 468 (117th ed.1997). The Court suspects that the head of a family earning less than $32,000 would certainly consider "large" a political contribution in excess of $1,075.
In the end, perhaps this analysis illustrates what the Buckley Court meant when it said that a judge has "no scalpel to probe," whether a $1,000 or a $2,000 contribution ceiling would be more appropriate. 421 U.S. at 30, 95 S.Ct. 1365; see also id. (declaring that Congress's failure to structure FECA's contribution limitations to take account of the graduated expenditure limitations for congressional and presidential campaigns "does not invalidate the legislation"). While it is undoubtedly true that $1,000 today will not buy what it did in 1976, a court analyzing whether a given statute comports with the first amendment must hesitate before "imposing judicial formulae so rigid that they become a straightjacket that disables Government from responding to serious problems." Denver Area Educ. Telecomms. Consortium, Inc. v. F.C.C., 518 U.S. 727, 116 S.Ct. 2374, 2385, 135 L.Ed.2d 888 (1996). There is more than ample reason to defer to the considered judgment of the Missouri legislature here.
Accordingly,
IT IS HEREBY ORDERED that defendants' motion for summary judgment [# 21] is granted, and that plaintiffs' motions for summary judgment [# 24] and for a preliminary injunction [# 5] are denied.
IT IS FURTHER ORDERED that defendant Robert P. McCullough's motions to dismiss pursuant to Fed.R.Civ.P. 21[# 19] and to join as necessary and indispensable parties all prosecutors in the state of Missouri [# 20] are denied as moot.
IT IS FURTHER ORDERED that defendant Robert P. McCullough's motion to join in the various filings made by the state defendants in this case [# 27] is granted.
IT IS FURTHER ORDERED that Joan Bray's motion to intervene as a defendant [# 29] and Common Cause's motion for leave *743 to participate as amicus curiae are denied as moot.
NOTES
[1] Given its disposition of this matter, the Court believes that it need not reach defendant Robert P. McCullough's motion to dismiss or, in the alternative, to join as necessary and indispensable parties all prosecutors in the state of Missouri. For the same reason, the Court will deny as moot the motion of Joan Bray to intervene as a defendant and the motion of Common Cause to participate as amicus curiae.
[2] An election cycle includes both the primary and the general election. See Mo. Ann. Stat. § 130.011(16) (West 1997); Carver, 72 F.3d at 635 n. 3. A 1997 amendment to § 130.011 deleted the definition of "election cycle." See Mo. Ann. Stat. § 130.011 (West Supp.1998). The limits contained in § 130.032 (i.e., the statute at issue here), unlike those of Proposition A, apply on a per election basis. See Mo. Ann. Stat. § 130.032 (West Supp.1998).
[3] In Buckley, the Supreme Court, applying a strict scrutiny standard of review, held that provisions of the Federal Election Campaign Act ("FECA") establishing a $1,000 limitation on contributions to campaigns for federal elected office were constitutional. In upholding the limitation, the Court noted that limiting the amount a person may give to a candidate "involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by the contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." 424 U.S. at 21, 96 S.Ct. 612. FECA's limits remain unchanged to this day. See 2 U.S.C. § 441a.
[4] In Day v. Holahan, 34 F.3d 1356 (8th Cir. 1994), the Eighth Circuit enunciated the principle that the effect of inflation should be considered in determining the constitutionality of campaign contribution limits. The Day court invalidated a Minnesota statute limiting contributions to and from political committees to $100. While recognizing that "the Buckley limit was never declared to be a constitutional minimum," id. at 1366, the court observed that "a $100 contribution in 1976 [the year that Buckley was decided] would have a value of $40.60 in 1994 dollars, or approximately four percent of the $1,000 limit approved in Buckley." Id.
[5] In dicta, the court appeared to endorse Senate Bill 650's limits. See 72 F.3d at 641 ("[W]e generally accept the limits established by the legislature."); see also id. at 645 (stating that there are "substantial reasons for according deference to legislative enactments that do not exist with respect to proposals adopted by initiative").
[6] Newspaper stories and editorials from the same period tend to support the senator's statements. See, e.g., Jo Mannies, Auditor Race May Get Too Noisy To Be Ignored, St. Louis Post-Dispatch, Sept. 11, 1994, at 4B (reporting that Republican candidate for Missouri state auditor received a $40,000 contribution from a St. Louis-based brewery and $20,000 from a St. Louis bank); John A. Dvorak, Election Reform Backed Lid on Contributions to Campaigns Wins Carnahan's Support, Kansas City Star, Nov. 14, 1993, at B1 (quoting Governor Mel Carnahan as stating, "We need a system that will make sure that our democratic institutions care as much about John Doe and Jane Doe as they do about any big company or any wealthy individual"); Editorial, The Central Issue is Trust, St. Louis Post-Dispatch, Dec. 31, 1993, at 6C (observing that Missouri state treasurer's choice of Central Trust Bank of Jefferson City to handle most of the state's banking business raised an appearance of favoritism, as the treasurer had accepted approximately $20,000 from the same bank in his 1992 election campaign).
[7] In some sense, the vote on Proposition A might be viewed as such a poll. The initiative was depicted by the media as an attempt to "temper the influence of special interests and put political newcomers on a more level playing field at election time." Kevin Q. Murphy, Low-key Proposition A Would Refashion Election Financing, Kansas City Star, Oct. 27, 1994, at A1; Editorial, Four Proposals on the Missouri Ballot, St. Louis Post-Dispatch, Oct. 20, 1994, at 6B ("Proposition A would make further improvements to control influence-buying in elections that lawmakers were not willing to impose on themselves."); Voters Guide, St. Louis Post-Dispatch, Nov. 6, 1994, at 8 (describing Proposition A's goal as "limit[ing] the influence of special interests in government by putting low ceilings on how much anyone can give to a political candidate"). If the media's views are at all reflective of those of the public at large, then the fact that Missouri's voters voted for Proposition A in rather overwhelming numbers (the initiative was supported by seventy-four percent of those voting) is some indication that they shared those views. See Kathy Richardson, Letter to the Editor, St. Louis Post-Dispatch, Nov. 5, 1994, at 16 (describing political system as "money-influenced" and urging other citizens to vote for Proposition A); Robyn Steely, Editorial, Money and State Senators, St. Louis Post-Dispatch, Aug. 21, 1994, at 3B (claiming that "business interests, large contributions, war chests, inadequately disclosed information and myths about campaign financing all taint our democratic process").
[8] In Carver, the Eighth Circuit held that evidence of a political action committee's $420,000 contribution could not support the state's claim that Proposition A's contribution limits were narrowly tailored. See 72 F.3d at 642. However, under Buckley, that same evidence would support a showing of "real harm." As the Carver court noted, the Supreme Court in Buckley, in discussing large contributions, "specifically referred to disturbing examples surfacing after the 1972 election" that had been cited by the D.C. Circuit. 72 F.3d at 638 (citing 424 U.S. at 27, 96 S.Ct. 612). Those examples included a dairy industry pledge of two million dollars in support of President Nixon's re-election campaign, presidential campaign contributions totaling $1.8 million from thirty-one individuals holding ambassadorial appointments from President Nixon, and an additional three million dollars from six individuals seeking such appointments from the president. See Buckley v. Valeo, 519 F.2d 821, 839-40 and nn.36-38; Buckley, 424 U.S. at 27 n. 6, 96 S.Ct. 612 (citing the portion of the D.C. Circuit's opinion just mentioned); Carver, 72 F.3d at 638 n. 5 (same). Although all of those examples involved contributions far in excess of $1,000, the Supreme Court nevertheless rejected the appellants' objection that the $1,000 restriction was "unrealistically low because much more than that amount would still not be enough to exercise improper influence over a candidate or office-holder, especially in campaigns for statewide or national office." 424 U.S. at 30, 96 S.Ct. 612.
[9] Likewise, $525 today is the equivalent of $184.80 in 1976, and $275 the equivalent of $96.70 in 1976.
[10] Shrink PAC claims that the federal limit applicable to it is $5,000. However, the $5,000 limit applies only to "multicandidate" political committees. 2 U.S.C. § 441a(2). In order to qualify as such a committee, an entity must, inter alia, have received contributions from more than fifty persons and made contributions to five or more candidates for federal office. Id. at § 441a(4). Shrink PAC has provided no evidence that it meets any of those criteria.
[11] In Carver, the court indicated that an examination of the contribution limits imposed by other states was appropriate in determining whether Missouri's ceilings were "narrowly tailored." 72 F.3d at 641-42. In striking Proposition A, the court observed that the initiative would give Missouri "the lowest contribution limits in the nation." Id. at 642. Such is not the case with § 130.032. See, e.g., Alaska Stat. § 15.13.070(c)(1) (Michie 1996) ($1,000 per year limit on contributions to a candidate by a group other than a political party); Ariz.Rev.Stat. Ann. § 16-905 (West Supp.1997) ($750 per election limit on contributions from a single political committee to a candidate for statewide office, $300 if non-statewide); Conn. Gen.Stat. § 9-333q(a) (1997) ($1,500 per election limit on contributions to a candidate for lieutenant governor, secretary of state, treasurer, comptroller, or attorney general, $500 for candidates for state senator, $250 for candidates for state representative); Del.Code Ann. tit. 15, § 8010(a) (1993) ($1,200 limit per "election period" limit on contributions to a candidate for statewide office, $600 if non-statewide); Fla. Stat. Ann. § 106.08(1)(a) (West Supp.1998) ($500 per election limit); Ky.Rev.Stat. Ann. § 121.150(6) (Banks-Baldwin 1998) ($1,000 per election limit); Me.Rev.Stat. Ann. tit. 21-A, § 1015.2 (West Supp.1997) ($250 per election limit effective January 1, 1999, on contributions to non-gubernatorial candidates); Minn.Stat. Ann. § 10A.27.1(c) (West 1997) ($500 per election year limit on contributions to candidates for the office of secretary of state, state treasurer, or state auditor); Or.Rev.Stat. § 260.160(1) (1997) ($500 per election limit on contributions to statewide candidates, $100 if non-statewide); S.D. Codified Laws § 12-25-1.1 (Michie 1995) ($1,000 per year limit on individual contributions to a single candidate for state-wide office, $250 if non-statewide); Vt. Stat. Ann. tit. 17, § 2805(a) (1997 Supp.) (effective November 14, 1998, $200 per election limit on contributions from a political committee to a candidate for state representative, $300 to a candidate for state senator, $400 to a candidate for governor, lieutenant governor, secretary of state, auditor of accounts, or attorney general); see also Ann. Laws of Mass. ch. 55, § 6A (Lexis 1998 Supp.) (annual limit of $37,500 on total contributions that may be made by political action committees to candidates for state secretary, state treasurer, and state auditor, $18,750 for candidates for state senator, $7,500 for candidates for state representative).
[12] Under Colorado Republican, of course, Shrink PAC is free to expend funds in support of Fredman without regard to § 130.032's limits, so long as no coordination between the committee and the candidate takes place.
[13] In accordance with that provision, the Missouri Ethics Commission adjusted Missouri's limits effective January 1, 1998.