100 F.Supp.2d 990 (2000)
MISSOURI REPUBLICAN PARTY, et al., Plaintiffs,
v.
Charles G. LAMB, et al., Defendants.
No. 4:98CV1909 CDP.
United States District Court, E.D. Missouri, Eastern Division.
June 23, 2000.
*991 Douglas Bruce La Pierre, Washington University, St. Louis, MO, Patric A. Lester, Lester and Associates, St. Louis, MO, W. Bevis Schock, Clayton, MO, for plaintiffs.
James R. Layton, Paul Maguffee, Attorney General of Missouri, Assistant Attorney General, Jefferson City, MO, for defendants.

MEMORANDUM OPINION
PERRY, District Judge.
Missouri law limits the amount of money political parties can give to candidates for public office. The Missouri Republican Party and the individual plaintiffs argue that these statutory limits violate their First Amendment rights to freedom of speech and association. I believe that under the Supreme Court precedent of Nixon v. Shrink Missouri Gov't PAC the limits are constitutional, and I will therefore grant the state's motion for summary judgment.

I. Background Facts

The particular provision of Missouri's campaign finance reform law at issue in this case is found at Missouri Revised Statute § 130.032.4. That section limits the amount of cash and in-kind contributions that a political party committee can make to a candidate in any one election:
Except as limited by this subsection, the amount of cash contributions, and a separate amount for the amount of in-kind contributions, made by or accepted from a political party committee in any one election shall not exceed the following:
(1) To elect an individual to the office of governor, lieutenant governor, secretary of state, state treasurer, state auditor, or attorney general, ten thousand dollars;
(2) To elect an individual to the office of state senator, five thousand dollars;
(3) To elect an individual to the office of state representative, two thousand five hundred dollars; and
(4) To elect an individual to any other office of an electoral district, ward or unit, ten times the allowable contribution limit for the office sought.
Missouri Revised Statute § 130.032.2 requires that the limits contained in § 130.032.4 be adjusted for inflation in each even-numbered year by a calculation employing the cumulative consumer price index. In early 1998, the Ethics Commission increased the limits listed in § 130.032.4(1)-(3) to $10,750, $5,250, and $2,750, respectively.
A committee that accepts party contributions in excess of the statutory limits is subject to a significant penalty, unless it promptly returns the contribution to the contributor after being so instructed by the Ethics Commission. See Mo.Rev.Stat. § 130.032.7. The per-contribution penalty is one thousand dollars plus an amount equal to the contribution. The candidate and the candidate committee treasurer or deputy treasurer are personally liable for payment of that penalty. Alternatively, they may pay the penalty from campaign funds existing on the date that the committee was notified of the violation by the Ethics Commission. Id.
*992 Plaintiff Missouri Republican Party is a political party committee as defined by Mo.Rev.Stat. § 130.011(25). The individual plaintiffs are political candidates and candidate committees as defined by Mo. Rev.Stat. § 130.011(9) and officers of such candidate committees. Defendants are the executive director and members of the Missouri Ethics Commission and the Missouri Attorney General.
In the 1998 general election, the Missouri Republican Party made monetary contributions to several of the candidate committee plaintiffs. Those contributions exceeded the statutory limits. As a result, the Ethics Commission notified those plaintiffs that they were in violation of § 130.032.4's limits, and demanded that they return the Missouri Republican Party's contributions that exceeded the limits. After being advised that plaintiffs would file suit to enjoin enforcement of § 130.032.4, the Attorney General's office advised plaintiffs' counsel that the Ethics Commission would not seek to enforce the statute against plaintiffs pending a hearing on their request for a preliminary injunction. Plaintiffs then filed this action.

II. Procedural History

On January 13, 1999, I enjoined enforcement of § 130.032.4. Missouri Republican Party v. Lamb, 31 F.Supp.2d 1161 (E.D.Mo.1999). At the parties' joint request, I later stayed all further proceedings pending the United States Supreme Court's decision in Nixon v. Shrink Missouri Gov't PAC, 525 U.S. 1121, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999).
On January 24, 2000, the Supreme Court decided Nixon, and upheld Missouri's limits on campaign contributions made by individuals and entities other than political parties. Nixon v. Shrink Missouri Gov't PAC, ___ U.S. ___, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). Based on that opinion, defendants asked me to vacate the injunction in this case. On March 13, 2000, I denied the motion to vacate the preliminary injunction. I set the case for expedited treatment and trial on July 5, 2000.
Defendants moved for summary judgment, contending that the contribution limits at issue here, which are approximately ten times higher than those found constitutional in Nixon, do not violate the First Amendment as a matter of law. In opposition, plaintiffs claim that factual disputes regarding the nature of the party's financial support of its candidates preclude summary judgment.
After careful consideration of Nixon and the parties' summary judgment submissions, I find that there are no factual issues remaining for trial: Nixon governs this case and requires me to uphold Missouri's campaign contribution limits on political parties as a matter of law.

III. Discussion

A. Standards Governing Summary Judgment
In determining whether summary judgment should issue, I have viewed the facts and inferences from the facts in the light most favorable to the nonmoving parties, here the plaintiffs. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Under the governing standard, the defendants have the burden to establish both the absence of a genuine issue of material fact and that they are entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).
Applying this standard, I find no genuine disputes of material fact that would preclude summary judgment. Instead, the issues I must decide are purely legal: 1) whether the Republican Party's financial support of its candidates should be characterized *993 as contributions or expenditures;[1] and 2) if they are contributions, whether the limits survive as a matter of law under the standards set forth in Nixon.

B. Leave to Amend
Before turning to the merits, I must decide whether to permit plaintiffs to amend their complaint to challenge Missouri's limits on coordinated expenditures, which may be regulated as "in-kind" contributions under § 130.032.4.[2] The original complaint only challenged the cash contributions, but the proposed amendment alleges that the statute prohibits "coordination." This is a significant substantive change in the legal challenge to the statute, it has no factual tie to the enforcement action plaintiffs are threatened with here, and adding it would surely delay resolution of this case. I will deny leave to amend.
While leave to amend shall be freely given when justice so requires, Fed. R.Civ.P. 15(a), the Court may exercise its discretion and deny leave "when late tendered amendments involve new theories of recovery and impose additional discovery requirements" resulting in undue prejudice to the opposing party. Bell v. Allstate Life Ins. Co., 160 F.3d 452, 454 (8th Cir. 1998).
Plaintiffs present their proposed amendments regarding coordinated expenditures nearly two years after this case was filed. Although the proceedings in this matter were stayed pending the Supreme Court's decision in Nixon pursuant to an agreement between the parties, the case upon which plaintiffs principally rely to support their new "expenditures" argument, Colorado Republican Federal Campaign Committee v. Federal Election Comm'n, 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (plurality), was decided two years before they filed suit. Plaintiffs could have raised this issue in their original complaint (assuming they had facts to support such a challenge), but instead they merely challenged the constitutionality of the statute as it related to Missouri's impending enforcement proceedings against them for cash contributions in excess of the statutory limits. Although I will consider plaintiffs' argument that the limits on cash contributions should really be treated as expenditures, it is too late in the day to allow plaintiffs to challenge in this suit a different kind of financial support than was pleaded in the original complaint.
Plaintiffs' proposed amendments would also impose additional discovery requirements upon the parties and further delay final resolution of this case. Although in a different case these factors might not preclude granting leave to amend, the interests of justice favor timely resolution of the issues now before me. Defendants would be unduly prejudiced if plaintiffs were permitted to interject new issues into the case and impede a speedy and final ruling on the merits.

C. Contributions vs. Expenditures
Despite their position during the earlier phases of this case, plaintiffs now contend that the Missouri Republican Party's financial support of its candidates even if paid to the candidates directly  should be classified as expenditures. The *994 shift in plaintiffs' position is presumably to avoid application of Nixon and to fit this case within other Supreme Court precedent more favorable to plaintiffs' position.
So what, then, is at issue in this case: expenditures or contributions? There is no dispute that the financial support at issue in this case was money given directly to the candidates by the Missouri Republican Party. The Party gave money to the candidates, and the candidates themselves  not the Party  spent the money. I believe these are contributions as a matter of law.
The distinction between contributions and expenditures is at the heart of this debate because, "[w]hile contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor." Buckley v. Valeo, 424 U.S. 1, 22, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Nixon quoted and reaffirmed Buckley on the significance of the difference between giving money and spending money:
"[A] limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated symbolic act of contributing. At most, the size of his contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues." [Buckley, 424 U.S.] at 20-21, 96 S.Ct. 612, 46 L.Ed.2d 659 (footnote omitted).
. . . . .
We flagged a similar distinction between expenditure and contribution limitations in their impacts on the association right. While an expenditure limit "precludes most associations from effectively amplifying the voice of their adherents," id., at 22, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (thus interfering with the freedom of the adherents as well as the association), "the contribution limits leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates," ibid.; see also id., at 28, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659.
Nixon, 120 S.Ct. at 903-04.
In this case Missouri treated the Republican Party's money transfers to its candidates as contributions. It is true, as plaintiffs suggest, that the state's label of this kind of support as a "contribution" does not transform its financial support of its candidates into a "contribution" for constitutional purposes. Buckley and Nixon do that.
In an effort to reclassify the contributions as expenditures, plaintiffs make much of the fact that the Missouri Republican Party and its candidates engage in a "significant degree of coordination, consultation, and cooperation" before the money is donated. For example, John Hancock testified that "[t]he Missouri Republican Party generally makes contributions to candidates in cooperation and concert with those candidates in order to advance the candidate's chance to win and to advance the party's objectives." (Hancock Aff. *995 11/13/98 ¶ 5). Moreover, plaintiffs contend that there is a tacit understanding that the candidate should use the Missouri Republican Party's contributions to convey their shared message. In his most recent affidavit, Hancock also avers that the Missouri Republican Party's comprehensive control over its cash contributions to its candidates is demonstrated by the fact that if a candidate does not use the funds in the manner demanded by the party, the Missouri Republican Party will refuse to contribute additional monies to the wayward candidate. (Hancock Aff. 3/12/00 ¶ 39).
Despite this purported tight-fisted control over the way the funds are spent and the candidates' future cash-flow, the undisputed fact remains that it is the candidate, not the Missouri Republican Party, who spends the money. Plaintiffs Pierce, Zahnd and Reid testified that "once my committee received the [Missouri Republican Party's] contributions, I was free to spend the money as I saw fit." (Pierce Aff. 11/16/98 ¶ 4; Zahnd Aff. 11/16/98 ¶ 3; Reid Aff. 11/16/98 ¶ 4). There is some dissenting authority that all monies spent by a political party  whether independently or in coordination with a candidate  should be treated as expenditures, see Colorado Republican Federal Campaign Committee v. Federal Election Comm'n, 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (Kennedy, J. dissent), but even that reasoning would not apply here because the candidates, not the party, are spending the funds.[3] The transformation of the Missouri Republican Party's contributions into political debate involves speech by the individual plaintiffs Pierce, Zahnd and Reid, not by the Missouri Republican Party. See Buckley, 424 U.S. at 21, 96 S.Ct. 612. For this reason, plaintiffs' attempt to reclassify the cash support as expenditures rather than contributions fails.

C. Contribution Limits on Political Parties after Nixon

Of course, the determination that the money given should be considered a contribution does not end the constitutional inquiry, for states are not free under the First Amendment to impose contribution limits without rhyme or reason. I must now decide whether and how Missouri may regulate contributions by political parties. The answer to the "whether" question depends on whether contributions made by political parties are subject to the same standards applied to contributions made by individuals and entities other than political party committees. If they are, there is little doubt that Nixon answers the "how" question.

1. The "Whether" Question
In Nixon, the Supreme Court adopted the analytical framework first set out in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), and held that state contribution limits "could survive if the [g]overnment demonstrated that contribution regulation was closely drawn to match a sufficiently important interest, though the dollar amount of the limit need not be fine tuned." Nixon, 120 S.Ct. at 904 (internal quotation marks and citations omitted). Rather than setting a specific dollar amount as the minimum constitutional threshold for contribution limits, the Supreme Court defined the relevant test as "whether the contribution limitation was so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." Id. at 909.
In support of its holding, the Court reaffirmed the distinction between contributions and expenditures for purposes of evaluating the constitutionality of campaign *996 finance legislation. Id. at 903-05. The Court also accepted the state's espoused interests in defending the legislation (the prevention of corruption and the appearance of corruption) without the rigorous evidentiary showing required by the Eighth Circuit in its decision in the case, Shrink Missouri Government PAC v. Adams, 161 F.3d 519 (8th Cir.1998). Instead, the Court relied in part upon the evidence presented in Buckley to demonstrate that the state's anti-corruption rationale was sufficiently supported to justify Missouri's contribution limits on individuals. 120 S.Ct. at 905-08.[4]
Although Nixon does not directly answer the question of whether contribution limits on political parties are evaluated under the same standards applied to contribution limits on individuals, it answers the question indirectly by making clear that their constitutionality hinges on the type of financial support being given to the candidate, not on the identity of the contributor: "[R]estrictions on contributions require less compelling justification than restrictions on independent spending." Nixon, 120 S.Ct. at 904 (quoting Federal Election Com'n v. Massachusetts Citizens for Life, Inc., 479 U.S. 238, 259-60, 107 S.Ct. 616, 93 L.Ed.2d 539 (1986)). The Nixon decision affirms the validity of Missouri's contribution limits generally and the state's supporting anti-corruption rationale. Because Nixon expressly approved Missouri's claimed interests in limiting individual contributions, it follows that the state's corresponding limits on political parties must also be upheld as long as the same rationale applies and they meet the criteria set out in Nixon.
Defendants assert that limits on contributions by political parties are constitutionally justified because they: 1) prevent evasion of the very contribution limits on individuals that Nixon upheld (the "anti-evasion rationale"); and 2) promote the state's interest in preventing corruption and the appearance of corruption in the electoral process (the "anti-corruption rationale"), an interest expressly approved by the Court in Nixon.
Plaintiffs attack the state's rationale by claiming: 1) the state's espoused anti-corruption interest loses its force in the context of contributions by political parties; and 2) the contribution caps on political parties do not promote the state's anti-evasion rationale because they do not prevent evasion of the individual contribution limits.
Plaintiffs' first point finds support in Colorado Republican, where the Supreme Court held that limits on independent expenditures by political parties in federal elections violate the First Amendment. 518 U.S. at 618, 116 S.Ct. 2309. Seven members of the Court supported the Court's judgment that limits on a political party's independent expenditures (i.e., expenditures made by a political party that are not coordinated with a candidate) violate the First Amendment. Justice Breyer announced the judgment of the Court and delivered an opinion, joined by Justices O'Connor and Souter, finding that limits on independent expenditures violate the First Amendment. Four other members of the Court  Chief Justice Rehnquist and Justices Kennedy, Scalia and Thomas  would have held that limits on both independent and coordinated expenditures (which are considered contributions pursuant to § 441a(a)(7)(B)(I) of the Federal Election Campaign Act or FECA) violate the First Amendment. Id. at 626, 116 S.Ct. 2309. Justices Kennedy and Thomas each authored opinions concurring in the judgment and dissenting in part. It is these opinions upon which plaintiffs so heavily rely.
*997 Justice Kennedy argued that the "central holding" of Buckley is "that spending on one's own speech must be permitted, ... and this is what political parties do" when they make expenditures on behalf of their candidates. Id. at 627, 116 S.Ct. 2309. For this reason, Justice Kennedy would have held that "[p]arty spending `in cooperation, consultation, or concert with' a candidate ... is indistinguishable in substance from expenditures by the candidate or his campaign committee," and both are protected by the First Amendment. Id. at 630, 116 S.Ct. 2309. However, Justice Kennedy also recognized that "Congress may have authority, consistent with the First Amendment, to restrict undifferentiated political party contributions which satisfy the constitutional criteria we discussed in Buckley, but that type of regulation is not at issue here." Id. Unfortunately for plaintiffs, that is exactly the type of regulation at issue here, so Justice Kennedy's opinion does not provide supporting authority for their position.
Justice Thomas' opinion provides more help to plaintiffs. He found that the "anti-corruption rationale" for contribution limits "loses its force" when "applied in the specific context of campaign funding by political parties" as follows:
What could it mean for a party to "corrupt" its candidate or to exercise "coercive" influence over him? The very aim of a political party is to influence its candidate's stance on issues and, if the candidate takes office or is reelected, his votes ... For instance, if the Democratic Party spends large sums of money in support of a candidate who wins, takes office, and then implements the Party's platform, that is not corruption; that is successful advocacy of ideas in the political marketplace and representative government in a party system.
518 U.S. at 646, 116 S.Ct. 2309. While I find Justice Thomas' reasoning concerning the nature of political parties appealing as a policy statement, I believe that Nixon requires me to reject it for purposes of deciding this case.
The Nixon Court distinguished Colorado Republican as inapposite on contribution limits because "the issue in question was limits on independent expenditures by political parties, which the principal opinion expressly distinguished from contribution limits." 120 S.Ct. at 907. Given this latest pronouncement by (a majority of) the Supreme Court on the inapplicability of Colorado Republican to campaign contribution limits, I am not free to strike down Missouri's contribution limits by relying upon partially dissenting opinions issued in that case.
I am also not persuaded that the reasoning of the lower courts which considered the Colorado Republican case on remand has any application to this case. First, I do not believe the Tenth Circuit correctly applied Nixon.[5] More importantly, this *998 case is about money the Missouri Republican Party gave to the candidates, not about money the Republican Party spent on radio ads or other candidate campaign needs.
When the anti-corruption rationale is viewed in tandem with the anti-evasion rationale, as I believe it should be, Justice Thomas' Colorado Republican reasoning becomes less persuasive. Missouri's contribution limits on political parties work to prevent corruption and the appearance of corruption in part by precluding contributors from evading the state's individual limits found constitutional in Nixon.
Beginning in Buckley, the Supreme Court recognized the need to deter evasion of individual limits as a constitutionally valid justification for imposing additional contribution limits. The Buckley Court upheld FECA's $25,000 "per election cycle" ceiling on the amount of contributions by a single individual to any combination of candidates for federal office as follows:
The overall $25,000 ceiling does impose an ultimate restriction upon the number of candidates and committees with which an individual may associate himself by means of financial support. But this quite modest restraint upon protected political activity serves to prevent evasion of the $1,000 contribution limitation by a person who might otherwise contribute massive amounts of money to a particular candidate through the use of unearmarked contributions to political committees likely to contribute to that candidate, or huge contributions to the candidate's political party. The limited, additional restriction on associational freedom imposed by the overall ceiling is thus no more than a corollary of the basic individual contribution limitation that we have found to be constitutionally valid.
424 U.S. at 38, 96 S.Ct. 612. The Supreme Court upheld this "corollary" provision of FECA without any discussion of the issues of corruption, the appearance of corruption or other compelling interests that it discussed at length in connection with upholding the per candidate contribution limits on individuals. Id.
The Supreme Court later applied the anti-evasion rationale to uphold limits on contributions made to political action committees in California Medical Assoc. v. Federal Election Comm'n, 453 U.S. 182, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981). Justice Marshall, delivering a part of the opinion of the Court in which only four justices joined, noted that "Congress enacted [the limitations on contributions to political action committees] in part to prevent circumvention of the very limitations on contributions that this Court upheld in Buckley." Id. at 197-98, 101 S.Ct. 2712 (Marshall, J.). He further stated that "it is clear that this provision [of FECA] is an appropriate means by which Congress could seek to protect the integrity of the contribution restrictions upheld by this Court in Buckley." Id. at 199, 101 S.Ct. 2712. Casting the deciding fifth vote, Justice Blackmun agreed that even under a rigorous standard of review, "contributions to multi-candidate political committees may be limited to $5,000 per year as a means of preventing evasion of the limitations on contributions to a candidate or his authorized campaign committee upheld in Buckley." Id. at 203, 101 S.Ct. 2712 (Blackmun, J.). This result followed because "[t]he statute challenged here is thus analogous to the $25,000 limitation on total contributions in a given year that Buckley held to be constitutional." Id. Once again, the Court upheld the statute without requiring a separate evidentiary showing that the ancillary limits actually prevented corruption or the appearance of corruption.
Given these cases establishing the importance of ancillary contribution limits to deter evasion of individual limits, the state may justify its contribution limits on political parties with its stated rationale.[6] *999 Plaintiffs protest that defendants have not provided sufficient evidence demonstrating that contribution limits on political parties are necessary to deter evasion of the individual limits in this particular case. They also contend that the statute does not actually deter evasion, because determined contributors can easily circumvent the individual limits even with the political party contribution limits in place. These arguments fail.
As for plaintiffs' first argument, the Supreme Court in Nixon made clear that "[t]he quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative judgments will vary up or down with the novelty and plausibility of the justification raised." 120 S.Ct. at 906. Because the Supreme Court has plainly recognized the anti-evasion rationale as sufficient to justify ancillary contribution limits, see Buckley, 424 U.S. at 38, 96 S.Ct. 612, the state's use of the same justification here cannot be deemed "novel" or "implausible." Moreover, the Supreme Court has never required empirical proof independent of that needed to justify individual contribution limits to legitimate reliance upon the anti-evasion rationale. See id.; CalMed, 453 U.S. at 197-99, 101 S.Ct. 2712 (Marshall, J.); id. at 203, 101 S.Ct. 2712 (Blackmun, J. concurring). Missouri certainly does not need to present evidence to justify its individual contribution limits after Nixon, and it does not need to present empirical proof to justify the state's interest in combating evasion of those limits through the use of contribution limits on political parties after Buckley.
Plaintiffs' second argument also fails. Nixon makes clear that the state's contribution regulations need not be the least restrictive means available for addressing the issue of campaign finance reform, only that they be "closely drawn" to match a "sufficiently important interest." 120 S.Ct. at 904. Because Missouri's contribution limits on political parties do prevent individuals from using political parties as a conduit for making large contributions to a candidate in excess of the individual limits (even if it does not eliminate the practice entirely), I find the statute is "closely drawn" to meet this "sufficiently important interest." See id. That Missouri could, or even should, enact more stringent campaign finance laws to quash this practice in its entirety does not invalidate the salutary measures already in effect.
For these reasons, Missouri may regulate contributions by political parties under the standards set forth in Buckley and Nixon.

2. The "How" Question
Because Buckley and Nixon govern the outcome of this case, Missouri's campaign contribution limits on political parties do not violate the First Amendment unless they are "so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." Nixon, 120 S.Ct. at 909.
Plaintiffs cannot seriously contend that the contribution limits at issue here would run afoul of Nixon, given that they were enacted in conjunction with Missouri's individual limits and that "in the period since the Missouri limits became effective candidates for state elected office have been quite able to raise funds sufficient to run effective campaigns, and ... candidates for political office in the state are still able to amass impressive campaign war chests." Id. at 909, 120 S.Ct. 897 (internal quotation marks and citations omitted).[7]
*1000 For a limit to be unconstitutional, there must be a "showing that the limits were so low as to impede the ability of candidates to amass the resources necessary for effective advocacy." Buckley, 424 U.S. at 21, 96 S.Ct. 612. As Nixon made clear, such a showing cannot be made through isolated examples of how a contribution limit has impeded a candidate's fundraising ability. 120 S.Ct. at 909. Instead, the test requires a showing of a "system" of suppressed speech, see id., a showing that is practically precluded by the Supreme Court's recent determination that such a system does not exist in Missouri's current political climate. Given the Supreme Court's findings on this point, I fail to see how the contribution limits on political parties  which are ten times higher than those found constitutional in Nixon  could destroy Missouri's burgeoning campaign climate and create a system of suppressed political advocacy.
I have carefully reviewed the campaign finance data submitted by both parties, which includes evidence presented to the Supreme Court in Nixon. I see no reason to engage in a lengthy recitation of that data here. Based on these submissions, I find no evidence that the contribution limits on Missouri's political parties have "impede[d] the ability of candidates to amass the resources necessary for effective advocacy." Buckley, 424 U.S. at 21, 96 S.Ct. 612. Instead, the undisputed evidence demonstrates that campaign expenditures by candidates have increased in some cases and decreased in others following the imposition of contribution limits. Contrary to plaintiffs' assertions, this evidence does not create a factual dispute precluding summary judgment. Rather, it establishes that, whatever the source of decreased spending, contribution limits have not suppressed political advocacy system-wide or rendered contributions pointless, especially when overall spending remains quite high in absolute terms.
Nor does plaintiffs' anecdotal evidence  which includes stories from the former chair of the Missouri Republican Party about a candidate who allegedly declined to run for state representative in 1998 because he could not receive more start-up funds and the party's discouraging a primary election campaign between two of the Republican Party's gubernatorial candidates in 1996 because of contribution limits  "point up a system of suppressed political advocacy that would be unconstitutional under Buckley." Nixon, 120 S.Ct. at 909. At best, these stories are isolated examples of alleged suppression that still do not amount to the system-wide failure required under Nixon. At worst, they are simply speculation about the effects of Missouri's contribution limits without any evidence of causation. In either event, they do not preclude summary judgment.

IV. Conclusion

Were I writing this opinion on a blank slate, I might well conclude that political parties should be exempted from the legal standards governing other kinds of campaign contributors because of their special role in American politics. I might even adopt the approach advocated by Justice Thomas in Colorado Republican and begin with the premise that "[i]n principle, people and groups give money to candidates and other groups for the same reason that they spend money in support of those candidates and groups: because they share social, economic, and political beliefs and seek to have those beliefs affect governmental *1001 policy." 518 U.S. at 640, 116 S.Ct. 2309 (Thomas, J.). I am not writing on blank slate, however, and cannot disregard the teachings of our highest court in favor of a different rule of law. I therefore find that Missouri's campaign contribution limits on political parties do not violate the First Amendment. This is a matter of law: there are no factual disputes remaining for trial, and so I will grant summary judgment to defendants.
The parties have indicated both to me and to the Eighth Circuit Court of Appeals that an appeal of this decision is certain. Despite my belief that this decision is the correct one under Supreme Court precedent, I remain concerned about the same issues that convinced me to leave the preliminary injunction in place pending this decision. I will therefore withhold granting the motion for summary judgment and entry of final judgment for a short time, to give the parties an opportunity to tell me their positions regarding an injunction pending appeal.
I believe resolution of this issue is best suited to an oral argument rather than further briefing. The trial of this matter set for July 5, 2000, will, of course, not be necessary, so the Court will use that time for the hearing.
Accordingly,
IT IS HEREBY ORDERED that the parties shall appear in Courtroom 3B at 9:30 a.m. on Wednesday, July 5, 2000, to present their positions regarding whether I should issue an injunction pending appeal. Final judgment in accordance with this opinion will not be entered until after the hearing and, of course, the preliminary injunction will remain in effect until that time.
IT IS FURTHER ORDERED that plaintiffs' motion for leave to amend their complaint [# 64] is granted only to the extent set out in footnote 2 of this opinion, and is denied in all other respects.
IT IS FURTHER ORDERED that defendants' motion to compel and in limine [# 76-1, 76-2] is denied as moot.
IT IS FURTHER ORDERED that as no trial will take place, the parties are not obligated to file pretrial submissions.
NOTES
[1] I disagree with plaintiffs' contention that I must first decide whether justifications for limits on individual contributions also apply to political parties before I can classify the financial support as either contributions or expenditures. Instead, the financial support must be characterized first and the state's rationale for regulating the support comes into play only after I decide that the money is, in fact, contributions.
[2] Plaintiffs also propose amendments concerning: 1) inflation adjustment of the political party contribution limits; 2) events in this case and the litigation involving Missouri's individual limits that have occurred since the filing of the original complaint; and 3) the test for review of contribution limits articulated in Nixon. Defendants do not object to these proposed amendments and, the Court shall accordingly grant plaintiffs leave to amend as to these allegations only.
[3] Of course, under Justice Thomas' approach in Colorado Republican, the distinction between expenditures and contributions would be eliminated for purposes of determining the constitutionality of campaign finance legislation because he "rejects the framework established by Buckley v. Valeo ...." 518 U.S. at 631, 116 S.Ct. 2309 (Thomas, J.).
[4] While declining to further define the state's evidentiary obligations in connection with justifying contribution limits, the Court also pointed to the "evidence introduced into the record by respondents or cited by the lower courts in this action and the action regarding Proposition A[as] enough to show that the substantiation of the congressional concerns reflected in Buckley has its counterpart supporting the Missouri law." Id. at 907.
[5] Because the Supreme Court lacked a majority to decide the "broader issue" of the constitutionality of coordinated expenditures, it remanded the case for further development of that issue. 518 U.S. at 626, 116 S.Ct. 2309. A substantial additional record was created and then the district court, ruling before Nixon was decided, found that limitations on coordinated expenditures by political parties also violated the First Amendment. See Federal Election Com'n v. Colorado Republican Federal Campaign Committee, 41 F.Supp.2d 1197, 1213 (D.Col.1999). The Tenth Circuit then affirmed, in a decision rendered after Nixon, and held that the FEC had failed to meet its burden of showing that the anti-corruption rationale applied to political party coordinated expenditures, which FECA defines as "contributions." Federal Election Com'n v. Colorado Republican Federal Campaign Committee, 213 F.3d 1221 (10th Cir. 2000). Although the Tenth Circuit majority stated that it was applying the Nixon standard, I believe that it in fact imposed a higher evidentiary burden not unlike that previously required by the Eighth Circuit and overruled by Nixon. Certainly, the Tenth Circuit expressed "difficulty" and "question" in applying the standard to party coordinated expenditures, id. at ___, 2000 WL 554688, at *5, stating that "simple cubbyholding of constitutional values under the labels of `contribution' and `expenditure' cheapens the currency." Id. at ___, 2000 WL 554688, at *11.
[6] Even the recent Tenth Circuit decision following remand in Colorado Republican recognized the validity of the anti-evasion rationale, stating that "if an individual used the party as a conduit to channel money to specified candidates, this would certainly threaten the integrity of the individual contribution limit." 2000 WL 554688 at *10.
[7] Although Nixon only involved the race for state auditor (one of the races also challenged here), the evidence presented to me in that case included campaign finance data from races for other state offices. See Shrink Missouri Gov't PAC v. Adams, 5 F.Supp.2d 734, 740-41 (E.D.Mo.1998). In finding that "candidates for state elected office have been quite able to raise funds sufficient to run effective campaigns, and ... candidates for political office in the state are still able to amass impressive campaign war chests," Nixon, 120 S.Ct. at 909, the Supreme Court also relied on this evidence. I therefore agree with defendants that the Supreme Court's findings on this point are not simply limited to the race for state auditor. In any event, there has been no evidence presented in this case that would lead me to find that the Supreme Court's conclusions in Nixon do not apply with equal force to Missouri's state senate campaigns as well.